PEOPLE v JONES (ON REHEARING AFTER REMAND)

Docket No. 152860. Submitted December 20, 1995, at Lansing. Decided March 1, 1996. Decided on rehearing February 20, 1998, at 9:25 A.M. In lieu of granting leave to appeal, the Court of Appeals opinion is modified in part and the case is remanded to the Oakland Circuit Court, 458 Mich ___.

Alphonzo R. Jones was convicted by a jury in the Oakland Circuit Court, Alice L. Gilbert, J., of assault with intent to commit murder and possession of a firearm during the commission of a felony and, thereafter, pleaded guilty of being an habitual offender, third offense. During the course of the trial, Christine Berry, a former domestic companion of the defendant and a neighbor of the victim of the assault, testified that a short time before the assault, the defendant arrived at her home in a vehicle driven by Alicia Love. Ms. Berry testified that Ms. Love shouted vulgarities and profanities for five minutes. Over a hearsay objection, Ms. Berry was permitted to testify that Ms. Love had shouted: "Bitch come out, I'm going to kick your ass. And Alphonzo don't want you, Alphonzo don't love you." The assault took place a short while later when the complainant confronted the defendant and Ms. Love concerning their behavior. The defendant appealed, raising a number of claims of error, including the claims that the prosecution had failed to bring the defendant to trial within 180 days in accordance with the requirement of MCL 780.131(1); MSA 28.969(1) and MCR 6.004(D) and that the trial court erred in sentencing the defendant both for the underlying assault conviction and for being an habitual offender. The Court of Appeals, O'Connell, P.J., and Saad and W. J. Giovan, JJ., in a per curiam opinion that specifically indicated that the Court of Appeals was not retaining jurisdiction, remanded the case to the trial court for an evidentiary hearing in which the claim of a violation of the 180-day rule was to be addressed and for amendment of the judgment of sentence by the vacation of the sentence for the underlying offense. Unpublished opinion per curiam of the Court of Appeals, issued March 1, 1996 (Docket No. 152860). The defendant filed a motion for rehearing, seeking to have the Court of Appeals retain jurisdiction during the pendency of the proceedings in the trial court on remand. The Court of Appeals thereafter ordered that the motion for rehearing be held in abeyance pending the decision

of the trial court following the hearing on remand. The trial court conducted the ordered evidentiary hearing and found no violation of the 180-day rule. The defendant renewed his motion for a rehearing, which the Court of Appeals granted.

On rehearing after remand, the Court of Appeals *held*:

1. The trial court properly concluded that despite the fact that the trial of the defendant in this matter did not commence until the 186th day after the state acquired jurisdiction over the defendant for the purpose of 180-day rule, the prosecution nevertheless satisfied the requirement of the 180-day rule. The trial court properly held that neither a seven-day adjournment at the request of the defense counsel nor the three-day period during which the defendant was being tried on an unrelated criminal charge was chargeable to the prosecution and that those periods could not be counted against the 180-day period.

2. The defendant's claim of denial of a speedy trial, which was based on the assertion that the prosecution's delay in bringing the case to trial resulted in the unavailability of a defense witness who would have testified that he rather than the defendant had shot the victim, is without merit in view of the defendant's trial testimony that he shot the victim but without the requisite intent to kill.

3. The prosecution's repeated reference to the defendant's prior conviction for breaking and entering with intent to commit larceny as evidence of the defendant's propensity to commit crime was error because it was a use of that evidence for the purpose expressly prohibited by MRE 404(a), which forbids evidence of character to prove conduct on a given occasion. While the court had initially approved evidence of the conviction under MRE 609 as relevant to the defendant's credibility as a witness, the prosecutor's repeated reference to the prior conviction for its forbidden purpose, particularly in view of repeated adverse rulings by the court, cannot be regarded as harmless misconduct and requires reversal of the defendant's conviction.

4. Because a retrial will be required, the question of the admissibility of the testimony of Ms. Berry concerning the remarks made by Ms. Love must be addressed. The objection imposed by the defense was that Ms. Berry's testimony concerning Ms. Love's remarks was inadmissible as hearsay. Pursuant to MRE 801(c), hearsay is defined as a "statement" that is made in a trial or hearing by someone other than the declarant that is offered to prove the truth of the matter asserted. MRE 801(a) defines a statement as a written or oral assertion or the nonverbal conduct of a person that is intended as an assertion.

5. The first clause of the challenged declaration is a command rather than an assertion, and, accordingly, it is not a statement within the meaning of MRE 801(a) and, thus, cannot be hearsay within the meaning of MRE 801(c). Although the remainder of the challenged declaration did consist of assertions, those statements were not offered to prove the truth of the matters asserted and, thus, are not hearsay within the meaning of MRE 801(c).

6. Michigan does not include within its definition of hearsay the doctrine of an implied assertion. Under the definition of hearsay set forth in MRE 801, an implied assertion is a contradiction in terms and a euphemism for declining to apply the rules relating to hearsay as they are written.

Reversed and remanded.

O'CONNELL, P.J., concurring in part and dissenting in part, stated that the testimony of Christine Berry concerning the statements made by Alicia Love shortly before the assault was inadmissible because, to the extent that only the literal denotation of those statements is considered, the statements are not relevant to any fact at issue with respect to the defendant's guilt and, to the extent that the statements were intended to demonstrate that the defendant was agitated immediately before the assault, the statements contained an implied assertion that Love, and by association defendant, was angry, they were offered to prove the truth of that implied assertion, and, accordingly, they were inadmissible hearsay unless they were shown to fall within one of the exceptions to the hearsay rule.

1. CRIMINAL LAW — SPEEDY TRIAL.

A defendant may be denied the right to a speedy trial where the prosecution's delay in bringing the case to trial results in the unavailability of a defense witness who would have testified that the witness rather than the defendant had committed the crime; such a claim of denial of the right to a speedy trial is without merit, however, where the defendant testifies at trial that the defendant committed the crime.

2. CRIMINAL LAW — EVIDENCE — IMPEACHMENT — PRIOR CONVICTIONS.

Evidence of prior felony convictions may be used to impeach a criminal defendant where the probative value of the evidence outweighs the prejudicial effect; however, evidence of prior felony convictions may not be used to prove that a defendant acted with a criminal intent in the charged offense.

3. CRIMINAL LAW — EVIDENCE — HEARSAY — IMPLIED ASSERTION.

Michigan does not include within its definition of hearsay the doctrine of an implied assertion; under the definition of hearsay set forth in

Michigan Rules of Evidence, an implied assertion is a contradiction in terms and a euphemism for declining to apply the rules relating to hearsay as they are written (MRE 801).

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *David Gorcyca*, Prosecuting Attorney, and *Marilyn J. Day*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Ronald E. Steinberg*), for the defendant on appeal.

ON REHEARING AFTER REMAND

Before: O'CONNELL, P.J., and SAAD and W. J. GIOVAN[*], JJ.

W. J. GIOVAN, J. Defendant was convicted by jury of assault with intent to commit murder, MCL 750.83; MSA 28.278, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). He subsequently pleaded guilty to being an habitual offender, third offense. MCL 769.11; MSA 28.1083. He was sentenced to two years' imprisonment on the felony-firearm conviction, to be immediately followed by concurrent sentences of fifteen to forty years on the assault and habitual offender convictions.

Defendant appealed as of right to this Court, raising numerous allegations of error. In an opinion dated March 1, 1996, we remanded this matter to the circuit court for an evidentiary hearing addressing defendant's contention that the 180-day rule, MCL 780.131; MSA 28.969(1); MCR 6.004(D), had been violated and, in addition, to allow the circuit court to correct the

---

[*] Circuit judge, sitting on the Court of Appeals by assignment.

judgment of sentence by vacating the sentence imposed for the offense underlying the habitual offender conviction. MCL 769.13; MSA 28.1085; *People v Gren*, 152 Mich App 20, 27; 391 NW2d 508 (1986). We did not retain jurisdiction.

Defendant moved for rehearing on the issue of retention of jurisdiction, and in an order dated June 12, 1996, we held the request in abeyance pending the outcome of the evidentiary hearing. The evidentiary hearing was held in the circuit court in October 1996, the court concluding that there had been no violation of the 180-day rule. Defendant then renewed his request for rehearing in this Court. We granted the motion and now address the substance of defendant's appeal.

We agree with the circuit court that the prosecution carried its burden of demonstrating that there had been no violation of the 180-day rule. We reverse, however, on other grounds.

### I. THE 180-DAY RULE

As set forth in MCL 780.131; MSA 28.969(1), an inmate of the Department of Corrections "shall be brought to trial within 180 days" after the prosecution is given notice of untried charges against the defendant. At the hearing on remand the parties stipulated that the defendant became a state prisoner for purposes of the 180-day rule on December 15, 1989, that the 180th day would have been June 13, 1990, and that trial began on June 19, 1990, the 186th day.

Consistent with the Supreme Court's interpretation of the statute in *People v Hendershot*, 357 Mich 300; 98 NW2d 568 (1959), MCR 6.004(D) requires only that the prosecutor must "make a good faith effort to

bring a criminal charge to trial" within the applicable 180-day period. In the course of describing the intent of the statute the *Hendershot* Court said:

> The statute does not require the action to be commenced so early within the 180-day period as to insure trial or completion of trial within that period. If, as here, apparent good-faith action is taken well within the period and the people proceed promptly and with dispatch thereafter toward readying the case for trial, the condition of the statute for the court's retention of jurisdiction is met. [*Id.*, 304.]

To start with, we should not expect the people to have a formidable task to produce evidence of good-faith efforts toward trial within the 180-day period when the trial has in fact occurred on the 186th day. In any event, the evidentiary hearing held on remand established what the defendant had expressly denied at the hearing before trial, i.e., that on the original trial date of February 23, 1990, well within the 180-day period, defense counsel asked for and was granted a seven-day adjournment to complete preparation for trial. Ten days later, another charge pending against the defendant was tried from March 5 through March 7.

On remand the trial court correctly concluded that the seven-day period representing the adjournment granted to the defendant should not be charged against the prosecutor and that there was, accordingly, no violation of the 180-day statute. *Hendershot, supra.* Nor is the time consumed in trying the defendant's other charge counted against the 180-day period. *People v Hill*, 402 Mich 272, 282-283; 262 NW2d 641 (1978).

The defendant contends that his request for an adjournment should be irrelevant because the record

commands a conclusion that the prosecutor was not ready for trial on February 23, 1990. In support the defendant notes that on February 16, 1990 the prosecutor had filed a motion to be heard on February 23 to endorse two witnesses in addition to those already endorsed, that five of the seven witnesses called by the prosecution at trial were not endorsed until after February 23 because of mistake of the prosecutor, and that the prosecutor did not say on February 23 that he was ready for trial.

While we can suppose anything, there is something less than a certainty that the prosecutor would not have gone to trial on February 23 if the defendant had not requested an adjournment and had instead insisted on going to trial. One of the witnesses already endorsed on February 23 was the victim, whose account of the events was not materially contradicted at trial and whose testimony by itself would have supported the charges against the defendant. For all we know, the absence of any announcement by the prosecutor that he was prepared to go to trial is explained by his unwillingness to press an advantage against a defendant who has announced that he is not prepared to proceed to trial or, just as likely, by his recognition of the futility of attempting to do so. In any event, like the trial court, we decline to attribute greater weight to one of several possible hypotheses concerning a circumstance that never occurred than to the plain reality that the defendant requested an adjournment and the prosecutor did not. The trial court correctly determined that there was no violation of the 180-day rule.

## II. DENIAL OF SPEEDY TRIAL

The defendant claims that he lost the opportunity to present a witness favorable to him because of a combination of unreasonable delay by the prosecutor in bringing the case to trial and the trial court's refusal to grant the defendant a continuance until such time as the witness could be located. The prejudice claimed by the defendant is that the proposed witness, Robert Anderson, who had escaped from Maxey Boy's Training School by the time of trial, would have testified that it was he, not the defendant, who shot at the victim.

This claim of error is made, of course, after the trial, at which the defendant readily admitted that he shot at the victim, his sole defense being that he had not intended to kill him. The defendant now makes the argument that if he had had the opportunity to call Anderson as a witness, his strategy at trial might have been different. Accordingly, the defendant bases the present claim of error on the premise that he was deprived of the opportunity to present perjury in the trial court. Besides being meritless, the argument goes beyond the limits of legitimate advocacy.

## III. CHARACTER EVIDENCE

Consistent with MRE 609, the trial court ruled before trial that a 1987 conviction of the defendant for breaking and entering with intent to commit larceny could be used "for credibility purposes only" if the defendant should testify.

During cross-examination of the defendant the prosecutor inquired about the breaking and entering conviction and the following exchange occurred:

*Prosecutor:* You understood, did you not, sir, at the time that you broke into this home that was against the law, didn't you?

*Defense counsel:* Objection, your Honor. Objection, your Honor, please. Your Honor, it's irrelevant. It's irrelevant.

*The Court:* I will sustain the objection to that last question.

*Prosecutor:* If I could respond, your Honor. It goes to character, your Honor. It's a clearly permissible form. I want to establish that this individual has no regard for the law. He knowingly broke and entered a home.

After the Court repeated that the objection was sustained, and after a few intervening questions, the prosecutor continued:

*Q.* So you committed this B & E anyway, even though you knew it was against the law, correct ?

*A.* Yes.

*Q.* And you want the jury here today to believe that even though you've been convicted of a prior larceny—

*Defense counsel:* Objection, your Honor, please.

*The Court:* Sustained.

During closing argument the prosecutor returned to his theme that the defendant's prior conviction demonstrated disregard for the law:

I'm not even going to speculate about who was screaming, but the defendant was not happy, and again this defendant completely disregarded the law as he did in the breaking and entering, which I'll get to in a moment. He disregarded the law.

\*     \*     \*

I want to point out one other thing and that is impeachment. The reason I brought it up is this impeachment, his prior conviction is very consistent with this act. It's an absolute disregard—

*Defense counsel:* Objection, your Honor. Can we approach the bench, please ?

After the jury was taken from the courtroom following final argument, defendant moved for a mistrial on the basis of repeated misuse of the prior conviction. The prosecutor responded that his approach had been proper:

Your Honor, it is my opinion, and I haven't heard any authority from Mr. Cleary [defense counsel] to support his position, but it's my opinion that I properly argued the prior conviction under 609 as it relates to truth, veracity as well as form of character. I utilized the same theme I started with in my opening. I relied on this act as well as attached to the other act, and I think it's permissible as to a form of impeachment and a form of character.

The Court denied the motion for a mistrial without comment.

The behavior of the prosecutor in the cited instances demonstrated, at a minimum, a void of awareness of one of the most frequently invoked common-law evidentiary rules of exclusion, applicable in civil and criminal cases alike, embodied in the Michigan Rules of Evidence in MRE 404 (a)[1] and reinforced in MRE 609,[2] i.e., that evidence of character, even though relevant, is more prejudicial than proba-

---

[1] Character Evidence Not Admissible to Prove Conduct; Exceptions; Other Crimes

(a) *Character evidence generally.* Evidence of a person's character or of a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except: . . . .

[2] MRE 609, which reinforces MRE 404(a) by restricting impeachment to evidence of crimes rationally related to truth-telling disposition, provides in pertinent part:

tive as a matter of law if offered to prove that a person acted in conformity therewith on a given occasion. The rationale of the rule as it applies in criminal cases was explained by the Court in *People v Allen*, 429 Mich 558, 568-569; 420 NW2d 499 (1988):

> A jury should not be allowed to consider the defendant's guilt of the crime before it on the basis of evidence of his propensity for crime. Finding a person guilty of a crime is not a pleasant or easy assignment for a representative group of twelve people. It is much easier to conclude that a person is bad than that he did something bad. Hence the appetite for more knowledge of the defendant's background and the slippery slope toward general "bad man" evidence.
>
> This appetite presents three types of impropriety. First, that jurors may determine that although defendant's guilt in the case before them is in doubt, he is a bad man and should therefore be punished. Second, the character evidence may lead the jury to lower the burden of proof against the defendant, since, even if the guilty verdict is incorrect, no "innocent" man will be forced to endure punishment. Third, the jury may determine that on the basis of his prior actions, the defendant has a propensity to commit

---

Impeachment by Evidence of Conviction of Crime

(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall not be admitted unless the evidence has been elicited from the witness or established by public record during cross examination, and

(1) the crime contained an element of dishonesty or false statement, or

(2) the crime contained an element of theft, and

(A) the crime was punishable by imprisonment in excess of one year or death under the law under which the witness was convicted, and

(B) the court determines that the evidence has significant probative value on the issue of credibility and, if the witness is the defendant in a criminal trial, the court further determines that the probative value of the evidence outweighs its prejudicial effect.

crimes, and therefore he probably is guilty of the crime
with which he is charged.

In the case at bar the prosecutor seemed to believe
that he was entitled to use the defendant's prior con-
viction for its forbidden purpose, and he was not
deterred from that view in spite of several rulings by
the trial judge. While we do not conclude that the
prosecutor's transgressions in this regard were inten-
tional, see *People v Dawson*, 431 Mich 234; 427 NW2d
886 (1988), we believe that the repeated emphasis of
defendant's conviction for the expressly forbidden
purpose cannot be regarded as harmless and that the
defendant is therefore entitled to a new trial on the
charges against him.

This inappropriate attack against character by the
prosecutor was aggravated by the needless introduc-
tion into evidence of a police photograph of the
defendant. *People v Heller*, 47 Mich App 408; 209
NW2d 439 (1973). The victim testified that while in
the hospital he identified the defendant from a series
of photographs, and, over objection, the court admit-
ted into evidence a folder containing six photographs,
including the defendant's, on the basis that "identity is
always an issue."

It is true that the potential for prejudice might have
been mitigated in this instance because of the earlier
decision of the court to admit evidence of the defend-
ant's breaking and entering conviction for impeach-
ment purposes. Here, however, neither the in-court
nor the out-of-court identification of the defendant by
the witness had been challenged; nor had the identifi-
cations of prior witnesses been attacked. Had the
identification been challenged, moreover, there would
have been ample opportunity to introduce the photo-

graphs on redirect examination or, if necessary, during rebuttal. In the utter absence of any issue of identification, the admission of defendant's police photograph was gratuitous and not justified by the truism that identity is always an issue.[3]

### IV. HEARSAY

Because a retrial will be required, we address defendant's claim that the trial court committed error by admitting hearsay evidence. We conclude that the questioned evidence involved no hearsay.

The proofs at trial showed that Christine Berry had lived with the defendant, Alphonzo Jones, for several months in mid-1989. On September 11 of that year, a woman later identified as Alicia Love, drove a white automobile into the driveway of the house where Ms. Berry was living, carrying the defendant as a passenger and playing loud music. Ms. Berry testified without objection that she heard the woman shouting at her over a loudspeaker to come outside so that she could "kick my butt." The woman shouted vulgarities and profanities for five minutes. The hearsay objection was interposed to Ms. Berry's testimony that the woman shouted: "Bitch come out, I'm gonna kick your ass. And Alphonzo don't want you, Alphonzo don't love you."

Two neighbors emerged from their homes and, angered by the loud noise and the obscenities,

---

[3] Another incident that we expect will not be repeated on retrial was the prosecutor's suggestion during opening statement that the defendant should not hide behind the presumption of innocence. See *Mostade v Engle*, 507 F Supp 402 (ND Ohio, 1980). The defendant's objection was promptly sustained and no additional relief was requested. The prosecutor thereafter acknowledged the appropriate burden, and the jury was properly instructed regarding the presumption of innocence.

shouted at Ms. Love and the defendant. The vehicle left the neighborhood and returned a short time later, eventually driving into the driveway of one of the neighbors, complainant John Reed. Mr. Reed approached the vehicle and exchanged angry words with Ms. Love and the defendant concerning their behavior. When challenged by the defendant regarding what he would do, Reed threatened to throw an apple at the automobile. The vehicle left the neighborhood and shortly thereafter a green automobile drove up to Mr. Reed's residence. When defendant and another male emerged from the vehicle, Reed came out of his house and walked toward the defendant. After they exchanged more angry words, the defendant produced a handgun and discharged it into the ground. As Mr. Reed ran away, the defendant fired three shots at him, one of which struck Reed in the back. The defendant then fired two shots at Reed's house and fled with the other male.

To start with, the first sentence of the declarant's out-of-court speech ("Bitch, come out") does not fit the first element of hearsay because it is not a "statement."

> "Hearsay" is a *statement*, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. [MRE 801(c) (emphasis supplied).]

As used in the definition of hearsay, the term "statement" means an *assertion:*

> A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion. [MRE 801(a).]

"Bitch, come out" contains no assertion. It is incapable of being true or false. It is a command, not an assertion, and cannot be hearsay because it doesn't qualify as a "statement."

The remainder of the challenged declaration consists of two sentences that *are* assertions. ("I'm gonna kick your ass. And Alphonzo don't want you, Alphonzo don't love you.") Those statements were not offered, however, to prove the truth of the matters asserted by the declarant. They were not offered, for example, to prove that Ms. Love was going to assault Ms. Berry. By the time of trial it was known with certainty that she had not kicked her, and the statement could not have been offered for that purpose. Nor was the evidence offered to prove that Alphonzo didn't love Ms. Berry, as it did not matter for the prosecutor's purpose what might have been the particular source of the defendant's anger toward Ms. Berry.

Ms. Love's words were offered, rather, as an integral part of the series of events that led to the shooting of the victim, which events included Ms. Love's verbal conduct—the more significant part—as well as any other part of her behavior. In this instance her assertions were a component of the threat she was making to Christine Berry, a threat being an act done with words that is admissible as nonhearsay. *Gibson v Group Ins Co of Michigan*, 142 Mich App 271, 277; 369 NW2d 484 (1985).

The defendant argues that the evidence is hearsay because the words of another tend to establish circumstantially his anger and, thus, his motive to kill. But if that is what the evidence shows, that is what evidence is supposed to do. Hearsay is not defined by

whether the evidence is effective. The rules of evidence protect the defendant against hearsay, not the facts of life.

Indeed, in saying that his motive was shown *circumstantially* by showing Ms. Love's state of mind, the defendant identifies one of the reasons why the evidence is not hearsay. As the court noted in *State v Martin*, 458 So 2d 454, 460-461 (La, 1984):

> An out of court statement may also be offered to show the speaker's state of mind. The statement may be a direct assertion of the speaker's state of mind or it may indirectly tend to establish that the speaker had a particular state of mind. If the statement is a direct assertion of the speaker's state of mind, then it is offered for the truth of the matter asserted but it usually falls within an exception to the hearsay rule for declarations of a then existing state of mind. See McCormick [Evidence (Cleary ed), § 249]; 6 Wigmore [Evidence (Chadbourn rev), § 1790]; 4 Weinstein [Evidence, ¶ 801(c)[101] (1981)]; Federal Rule of Evidence 803(3). If the statement only indirectly tends to prove a certain state of mind then it is not hearsay because the truth of the assertion and the credibility of the declarant are not relied upon. Rather, the fact that the statement was made, regardless of its truth, is relevant to show the speaker's knowledge, intent, or some other state of mind. *State v Edwards*, 420 So 2d 663, 671 (La, 1982); *State v Sheppard*, 371 So 2d 1135, 1142 (La, 1979); McCormick, *supra*, sections 249, 295; 6 Wigmore, *supra*, section 1790.

While the declarant was asserting that the defendant didn't love Ms. Berry, the prosecutor was offering the evidence to prove something else, i.e., that the defendant was angry, and thus it was offered to prove something *other* than the truth of the matter asserted

by the declarant, and the evidence was therefore not hearsay.[4]

The concurring opinion of our colleague maintains that Ms. Love's words should be considered hearsay because they contain an "implied assertion" that she was angry. This is the same contention made by the defendant—that the words were hearsay for being circumstantial evidence of state of mind—under a different name. Because the "implied assertion" theory is sometimes invoked to classify out-of-court behavior as hearsay by what we consider a "back-door" approach, we believe that it merits discussion.

While a number of decisions over the years have regarded "implied" assertions as hearsay, we believe that the theory had a questionable origin, that it has never achieved general recognition in decided cases, that it is expressly negated by the modern rules of evidence, and that it is contrary to Michigan precedent.

The use of the term "implied assertion" to denote hearsay has occurred in situations where out-of-court conduct of a person, sometimes verbal and sometimes nonverbal, is offered in evidence to demonstrate that person's belief, from which the inference is offered that the belief is true, when it was not the actor's intent to communicate the matter to be proved in court. And so, to use a famous example, if the issue were the seaworthiness of a ship, evidence that the ship captain sailed away with his family aboard

---

[4] The hearsay version by the declarant would have been, "Alphonzo Jones is angry." If she had said that, the evidence would probably have been nevertheless admissible as a hearsay *exception*; a present sense impression, MRE 803(1); or perhaps as an excited utterance as well, MRE 803(2), depending on the available foundation.

after making a thorough inspection of the ship would be considered hearsay as being the captain's implied assertion that the ship was seaworthy.[5]

All discussions of the issue begin with a famous and protracted early 19th century English case, *Wright v Doe d Tatham*, 7 Adolph & E 313; 112 Eng Rep 488 (Exch Ch, 1837), aff'd 5 Cl & F 670; 7 Eng Rep 559 (HL, 1838),[6] in which the issue was the competence of a testator, John Marsden, to make a will.

---

[5] The example is one of several hypotheticals that the unsuccessful litigant in *Wright v Doe d Tatham*, 7 Adolph & E 313; 112 Eng Rep 488, 516 (Exch Ch, 1837), had proposed to the court as examples of nonhearsay conduct, the others being "the . . . conduct of the family or relations of a testator, taking . . . precautions in his absence as if he were a lunatic; his election, in his absence, to some high and responsible office; the conduct of a physician who permitted a will to be executed by a sick testator . . . ." The opinion of Baron Parke in the Court of Exchequer Chamber labeled all the hypotheticals as hearsay.

[6] We have not examined the common law preceding the *Wright* case. However, since none of the twenty-one opinions in the last two levels of appellate review cite a common-law precedent deciding whether nonassertive conduct is eligible to be hearsay, it is a fair inference that the issue was one of first impression.

There was a precedent, however, that the judges declined to apply. Several of the opinions noted that the letters would have been admissible in the ecclesiastical courts, where they would have been weighed by a judge, adding that a jury should not be trusted with the same evidence. See, e.g., opinion of Judge Bosanquet in the Enchequer Chamber, 112 Eng Rep 512:

Those Courts are constituted upon principles very different from those which regulate the Courts of Common Law. Where the Judges are authorised to deal both with the facts and the law, a much larger discretion with respect to the reception of evidence may not unreasonably be allowed than in Courts of Common Law, where the evidence, if received by the Judge, must necessarily be submitted entire to the jury. By the rules of evidence established in the Courts of Law, circumstances of great moral weight are often excluded, from which much assistance might in particular cases be afforded in coming to a just conclusion, but which are nevertheless withheld from the consideration of the jury upon general principles, lest they should produce an undue influence upon the minds of persons unaccustomed to consider the limitations and restrictions which legal views upon the subject would impose.

The contestants over the substantial assets of the estate were Wright, Marsden's steward and the beneficiary of the will, and the eventual victor, Marsden's heir-at-law, "Admiral" Tatham, as he was referred to in the reports. In support of the testator's competence, the proponent had offered in evidence three letters written to the testator regarding everyday matters over a period, as tending to show that the correspondents wrote as they would to a person of ordinary intelligence. Against the contention that the letters were circumstantial evidence of Marsden's competence, a majority of the judges held, in the end,[7] that the letters amounted to the implied opinion of the writers that the addressee was competent and that those opinions were hearsay for not being under oath and subject to cross-examination.

A result that excluded three letters written without intent to communicate anything about Marsden's competence must have seemed obnoxious to Wright's counsel, who had argued that the letters were no less admissible than other evidence that had been received in the trial:

> Many instances were given of the treatment which Marsden received from Wright and from others. It was stated . . . that Marsden was treated as a child by his own menial servants; that, in his youth, he was called, in the village where he lived, "Silly Jack," and "Silly Marsden," and was never talked to "as a man that was capable as any thing, but as a child;" that a witness had seen boys shouting after him, "There goes crazy Marsden," and throwing dirt at him, and had persuaded a person passing by to see him home; and

---

[7] At an earlier stage of appeal, a four to three majority of the judges had opined informally that the letters were admissible, but that result was not precedential, because the appeal at that stage was resolved on another point. *Wright, supra,* 112 Eng Rep 489.

that once, when Marsden passed the evening at a gen-
tleman's house . . . the elder persons of the family sat down
to whist, and, Ellershaw mentioning that Marsden was una-
ble to play, some children were sent for, and he was put to
play with them at loo, at a side table, a man-servant super-
vising the game. [*Wright, supra,* 112 Eng Rep 490.]

Of all the opinions written in the last two levels of
appellate review, only one, that of Lord Denham in
the Court of Exchequer Chamber, made any attempt
to explain why letters that expressed nothing overtly
about competence should be excluded as hearsay,
while at the same time it was permissible to receive
other out-of-court speech that reeked of opinion:

The hardship of excluding these letters was powerfully
urged, since it was said that letters of a contrary tendency
might undoubtedly have been given in evidence, and that
the jury were in fact much influenced by the manner in
which the testator was treated by children pursuing him in
the street like one deprived of reason. But the answer is,
that letters of a contrary tendency, tendered under the
same circumstances, have never, to our knowledge, been
held admissible, nor could be, in our opinion received. So
the insults offered to him as an idiot by boys, when he
walked out, are not evidence as the acts of the boys: their
treatment of him as such is nothing; but the manner in
which he received that treatment falls within the scope of
our rule, and may certainly furnish strong proofs in affirm-
ance or refutation of the proposition under inquiry. [*Id.*,
494.]

There should be some difficulty understanding how
a jury that was considered so unsophisticated that
they would be improperly influenced by three innocu-
ous letters was not supposed to learn from this evi-
dence that the boys had a low opinion of Marsden's
intellect. Nevertheless, if the only force of the evi-

dence lay in Marsden's reactions to the taunts, the scores of pages of the reports of the case, including the opinion of Lord Denham himself, are inexplicably devoid of any reference to his reaction.

The holding of *Wright v Doe d Tatham* was not revisited in the House of Lords for more than 150 years,[8] until it resurfaced in *Regina v Kearley*, [1992] 2 AC 228. In a prosecution for possession of drugs with intent to supply, the trial court had admitted evidence that, after the defendant's arrest, a number of telephone calls were intercepted at his house, the callers asking for the defendant and requesting to be supplied drugs; and that a number of others called at the house personally with the same request. The conviction was upheld in the Court of Appeal. Over vigorous dissent[9] and by a vote of three to two, the House of Lords reversed the conviction on the evidentiary issue, invoking *Wright v Doe d Tatham*. All the majority opinions stated that, even if it would be prudent to reevaluate the holding of *Wright v Doe d Tatham*, the House of Lords could not do so because of its decision a quarter century earlier in *Myers v Director of Public Prosecutions*, [1965] AC 1001, (also decided three to two) that no further judicial development of the law of hearsay was permissible and that any

---

[8] Throughout the earlier editions of a respected treatise on English evidence law, Phipson, the original author, maintained that *Wright v Doe d Tatham* had never been followed in England. In the 1976 edition, the new authors, while acknowledging that various instances of nonassertive conduct had been customarily received without hearsay implications, indicated that there had been no decision rejecting the *Wright* case. Phipson on Evidence (12th ed, 1976), § 633, p 271.

[9] "I believe that most laymen if told that the criminal law of evidence forbade them even to consider such evidence as we are debating in this appeal would reply 'Then the law is an ass.'" Opinion of Lord Griffiths, *Regina v Kearley, supra*, 236-237.

future correction should be left to a comprehensive review by Parliament:

> I fully appreciate the cogency of the reasons advanced in favour of a limitation or exception to the operation of the hearsay rule which would allow the admission of implied assertions of the kind in question. But is it open to your Lordships to modify judicially the common law rule as expounded in *Wright v Doe d Tatham*, 7 Ad & E 313 in the same sense as it has been modified legislatively in the United States by the Federal Rules of Evidence? Such a modification would involve not only overruling *Wright v Doe d Tatham* but also departing, in reliance on the Practice Statement of 1966 (*Practice Statement (Judicial Precedent)* [1966] 1 WLR 1234), from the precedents set by the decisions of this House in both *Reg v Blastland* [1986] AC 41 and *Myers v Director of Public Prosecutions* [1965] AC 1001.

> \*     \*     \*

> . . . However strong the temptation to legislate judicially in favour of what is seen as a "common sense" result and however tardy Parliament may appear to be in reforming an area of the law which is seen to be in need of radical reform, the uncertainty and confusion to which well intentioned attempts at judicial legislation can lead have been clearly demonstrated by recent decisions of your Lordships' House. The operation of the hearsay rule in modern conditions is in many respects unsatisfactory. But Lord Reid's warning that in this field of the law a judicial "policy of make do and mend is no longer adequate" is as true today as it was in 1964. However long overdue we may feel an overhaul of the hearsay rule in criminal cases to be, we should not be deluded into thinking that we can achieve it piecemeal. [*Regina v Kearley, supra*, 249-251 (opinion of Lord Bridge).]

Whatever the treatment was of the implied assertion theory in its country of origin, a smattering of early cases in the United States determined various

forms of nonassertive conduct to constitute hearsay,[10] though their rationale was not consistent.[11] On the whole, the "implied assertion" doctrine received scant attention in decided cases, probably because of the lack of recognition of any arguable hearsay objection. See Falknor, *The "Hear-Say" Rule as a "See-Do" Rule: Evidence of Conduct*, 33 Rocky Mt L R 133, 135 (1961).

If the courts were generally ignoring *Wright v Doe d Tatham* and the nonassertive conduct issue, the legal scholars were not, as the subject was vigorously discussed in a series of articles spanning decades.[12] Eventually, eminent writers recognized a fundamental difference in hearsay considerations between behavior that involves an intent to communicate a proposition and that which does not:

> Yet there is a difference, which lies in this: in the first example the conduct was intended to convey thought, in the second it was not. When there is no intention to communicate to any one there is very much less chance that the act was done in order to deceive, and hence the third and fundamental danger in admitting hearsay does not here exist, or at least not so strongly. Furthermore, as a rule the fact believed in this latter class of cases is a simple one, and hence the first and second dangers are decreased. Accordingly, there appears to be a sound distinction between the cases, which may be formulated in the state-

---

[10] See cases noted in the 1954 edition of McCormick, Evidence, § 229, pp 473-474. Ironically, one of the cases cited in footnote 15, *In re Hine*, 68 Conn 551; 37 A 384 (1897), excluded evidence that boys in the street made fun of a testatrix, while, as noted above, similar evidence had been admitted in *Wright v Doe d Tatham*. Cases that favored the admission of nonassertive conduct are also cited in § 229.

[11] McCormick, *The Borderland of Hearsay*, 39 Yale L J 489, 495 (1930).

[12] Many of the articles are cited in the footnotes in 5 Wigmore, Evidence (Chadbourn rev), § 1362, pp 3-10, and 2 McCormick, Evidence (4th ed) § 250, pp 106-117.

ment that only conduct apparently intended to convey
thought can come under the ban of the hearsay rule. [Selig-
man, *An Exception to the Hearsay Rule*, 26 Harv L R 146,
148-149 (1912).]

Falknor said essentially the same thing in a graphic
way:

A man does not lie to himself. Put otherwise, if in doing
what he does a man has no intention of asserting the exis-
tence or non-existence of a fact, it would appear that the
trustworthiness of evidence of this conduct is the same
whether he is an egregious liar or a paragon of veracity.
Accordingly, the lack of opportunity for cross-examination
in relation to this veracity or lack of it, would seem to be of
no substantial importance. [Falknor, *supra*, 136.]

Eventually McCormick explained the rationale for
excluding nonassertive conduct from the definition of
hearsay altogether:

People do not, prior to raising their umbrellas, say to
themselves in soliloquy form, "It is raining," nor does the
motorist go forward on the green light only after making an
inward assertion, "The light is green." The conduct offered
in the one instance to prove it was raining and in the other
that the light was green, involves no intent to communicate
the act sought to be proved, and it was recognized long ago
that purposeful deception is less likely in the absence of
intent to communicate. True, the threshold question
whether communication was in fact intended may on occa-
sion present difficulty, yet the probabilities against intent
are so great as to justify imposing the burden of establish-
ing it upon the party urging the hearsay objection.

Even though the risks arising from purposeful deception
may be slight or nonexistent in the absence of intent to
communicate, the objection remains that the actor's percep-
tion and memory are untested by cross-examination for the
possibility of honest mistake. However, in contrast to the
risks from purposeful deception those arising from the

chance of honest mistake seem more sensibly to be factors
useful in evaluating weight and credibility rather than
grounds for exclusion. Moreover, the kind of situation
involved is ordinarily such as either to minimize the likeli-
hood of flaws of perception and memory or to present cir-
cumstances lending themselves to their evaluation. While
the suggestion has been advanced that conduct evidence
ought to be admitted only when the actor's behavior has an
element of significant reliance as an assurance of trustwor-
thiness, a sufficient response here too is that the factor is
one of evaluation, not a ground for exclusion. Undue com-
plication ought to be avoided in the interest of ease of the
application. The same can be said with respect to the possi-
bility that the conduct may be ambiguous so that the trier
of fact will draw a wrong inference. Finally, a rule attaching
the hearsay tag to the kind of conduct under consideration
is bound to operate unevenly, since the possibility of a
hearsay objection will more often than not simply be over-
looked. [2 McCormick on Evidence (4th ed), § 250, pp 110-
111.[13]]

More significantly for our purposes, the "implied
assertion" theory was rejected with the adoption of
the Federal Rules of Evidence and their state counter-
parts. As we have seen, a "statement," the first ele-
ment of hearsay, is defined as an oral or written
assertion, or conduct intended as an assertion, a defi-
nition which by its own terms appears to leave no
room for an "implied" assertion. If there be any doubt
on the matter, we need only consult the original
authors of the rule, the Advisory Committee on Rules
of Evidence, to note that the concept of implied
assertions was premeditatedly eliminated in the draft-

---

[13] This passage, which first appears in 1972 in McCormick, Evidence
(2d ed), § 250, p 599, may therefore be the work of Professor Edward W.
Cleary, the General Editor of the second and third editions. By then , Pro-
fessor Cleary was serving as Reporter of the Advisory Committee on
Rules of Evidence, discussed later in the opinion.

ing of the rule, as is disclosed by the advisory committee's note concerning FRE 801(a):

Subdivision (a). The definition of "statement" assumes importance because the term is used in the definition of hearsay in subdivision (c). The effect of the definition of "statement" is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion. *The key to the definition is that nothing is an assertion unless intended to be one.*

It can scarcely be doubted that an assertion made in words is intended by the declarant to be an assertion. Hence verbal assertions readily fall into the category of "statement." Whether nonverbal conduct should be regarded as a statement for purposes of defining hearsay requires further consideration. Some nonverbal conduct, such as the act of pointing to identify a suspect in a lineup, is clearly the equivalent of words, assertive in nature, and to be regarded as a statement. Other nonverbal conduct, however, may be offered as evidence that the person acted as he did because of his belief in the existence of the condition sought to be proved, from which belief the existence of the condition may be inferred. This sequence is, arguably, in effect an assertion of the existence of the condition and hence properly includable within the hearsay concept. See Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv L Rev 177, 214, 217 (1948), and the elaboration in Finman, Implied Assertions as Hearsay: Some Criticisms of the Uniform Rules of Evidence, 14 Stan L Rev 682 (1962). Admittedly evidence of this character is untested with respect to the perception, memory, and narration (or their equivalents) of the actor, but the Advisory Committee is of the view that these dangers are minimal in the absence of an intent to assert and do not justify the loss of the evidence on hearsay grounds. No class of evidence is free of the possibility of fabrication, but the likelihood is less with nonverbal than with assertive verbal conduct. The situations giving rise to the nonverbal conduct are such as virtually to eliminate questions of sincerity. Motivation, the nature of the conduct, and the presence or absence of reli-

ance will bear heavily upon the weight to be given the evidence. Falknor, The "Hear-Say" Rule as a "See-Do" Rule: Evidence of Conduct, 33 Rocky Mt L Rev 133 (1961). *Similar considerations govern nonassertive verbal conduct and verbal conduct which is assertive but offered as a basis for inferring something other than the matter asserted, also excluded from the definition of hearsay by the language of subdivision (c).*

When evidence of conduct is offered on the theory that it is not a statement, and hence not hearsay, a preliminary determination will be required to determine whether an assertion is intended. The rule is so worded as to place the burden upon the party claiming that the intention existed; ambiguous and doubtful cases will be resolved against him and in favor of admissibility. The determination involves no greater difficulty than many other preliminary questions of fact. Maguire, The Hearsay System: Around and Through the Thicket, 14 Vand L Rev 741, 765-767 (1961).

For similar approaches, see Uniform Rule 62(1); California Evidence Code §§ 225, 1200; Kansas Code of Civil Procedure § 60-459(a); New Jersey Evidence Rule 62(1). [Emphasis supplied.]

The committee's rationale recognizes that, of the two obstacles to truth that cross-examination is designed to expose, insincerity and mistake, the former is by far the more significant, as any courtroom observer can attest. The risk of mistake in perception, memory, or narration is so small by comparison that loss of the evidence is not warranted.

Accordingly, we should not be surprised that the vast majority of cases decided under the Federal Rules of Evidence and their state counterparts that have addressed the issue have rejected the "implied assertion" theory. In *United States v Lewis*, 902 F2d 1176, 1179 (CA 5, 1990), for example, the police seized beepers the defendants were carrying at the time of their arrest for drug trafficking, a witness tes-

tified that he called the number displayed on an incoming call and that the voice responding asked, "Did you get the stuff?" When the officer answered affirmatively, the unidentified person asked, using the nickname of the other defendant, "Where is dog?" Against the argument that the caller's words were hearsay because they impliedly asserted that the defendants were expecting to receive contraband, the court affirmed the admission of the evidence on the basis that the speech consisted of questions, not assertions, citing FRE 801(a) and the advisory committee's note for the proposition that an assertion is an indispensable element of hearsay.

As Judge (now Justice) Clarence Thomas put it in *United States v Long*, 284 US App DC 405, 412-413; 905 F2d 1572 (1990), a case with facts like *United States v Lewis*, *supra*:

> The caller's words, thus, cannot be characterized as an "assertion," even an implied one, unless the caller intended to make such an assertion. While Long's criticism of a rigid dichotomy between express and implied assertions is not without merit, it misses the point that the crucial distinction under rule 801 is between intentional and unintentional messages, regardless of whether they are express or implied. It is difficult to imagine any question, or for that matter any act, that does not in some way convey an implicit message. One of the principal goals of the hearsay rule is to exclude declarations when their veracity cannot be tested through cross-examination. When a declarant does not intend to communicate anything, however, his sincerity is not in question and the need for cross-examination is sharply diminished. Thus, an unintentional message is presumptively more reliable. *See United States v Groce*, 682 F2d 1359, 1364 (CA 11, 1982); 4 J Weinstein & M Berger, *Weinstein's Evidence* ¶ 801(a)[01] (1988). Evidence of unintended implicit assertions is "[a]dmittedly . . . untested

with respect to the perception, memory, and narration (or
their equivalents) of the actor," but "these dangers are mini-
mal in the absence of an intent to assert and do not justify
the loss of the evidence on hearsay grounds." Fed R Evid
801 advisory committee note.

Other authorities that have declined to classify nonas-
sertive conduct as hearsay include *United States v
Jackson*, 88 F3d 845 (CA 10, 1996) (a telephone
caller's response to a page asks "Is this Kenny?"
admissible as evidence that the defendant had been in
possession of the pager); *United States v Oguns*, 921
F2d 442 (CA 2, 1990) (telephone caller asks for the
defendant and asks "Have the apples arrived there?"
admissible as evidence that the defendant was
expecting narcotics); *United States v Weeks*, 919 F2d
248 (CA 5, 1990) (unidentified persons addressing the
defendant as "Gato" was their nonassertive use of the
name and therefore nonhearsay evidence that the
defendant was Gato); *United States v Lis*, 120 F3d 28
( CA 4, 1997) (error to exclude arithmetic calculations
made by the defendant's deceased husband offered to
show that large sums of money were product of his
embezzlement and not hers); *United States v Perez*,
658 F2d 654 (CA 9, 1981) (testimony that an accom-
plice referred to the defendant by name on the tele-
phone while making arrangements for delivery of
drugs admissible to show the defendant's complicity);
*United States v Singer*, 687 F2d 1135 (CA 8, 1982)
(landlord's envelope addressing a termination of ten-
ancy notice to two persons not hearsay when offered
to show that those persons lived together); *United
States v Groce*, 682 F2d 1359 (CA 11, 1982) (pencil
marks on a nautical chart fixing positions of a vessel
admissible to show intended course of the vessel);

*United States v Short*, 790 F2d 464 (CA 6, 1986) (child's behavior showing precocious knowledge of sexual matters while playing with anatomically correct dolls not hearsay as an implied assertion that she was a victim; similarly, *In re CL*, 397 NW2d 81 [SD, 1986], and *In re the Dependency of Penelope B*, 104 Wash 2d 643; 709 P2d 1185 [1985]); *United States v Zenni*, 492 F Supp 464 (ED Ky, 1980) (unidentified telephone callers directing the placing of bets on sports events admissible as nonhearsay evidence that the premises were used for illegal bookmaking); *State v Carillo*, 156 Ariz 120, 121; 750 P2d 878 (1987) (murder victim's statement on the telephone while speaking to witness, "Hector, don't do that now," not hearsay to show that the defendant was in victim's apartment); *State v Collins*, 76 Wash App 496; 886 P2d 243 (1995), review den 126 Wash 2d 1016 (1995) (telephone calls to premises occupied by the defendant seeking to make drug purchases admissible as circumstantial evidence that drugs were available from the defendant); *Guerra v State*, 897 P2d 447 (Wy, 1995) (daughter's letter found in the defendant's possession and requesting drugs from the defendant admissible on charge of delivery of controlled substances); *United States v Giraldo*, 822 F2d 205 (CA 2, 1987), cert den 484 US 969; 108 S Ct 466; 98 L Ed 2d 405 (1987) (messages on the defendant's answering machine ordering drugs admissible on charge of distributing cocaine); *State v Esposito*, 223 Conn 299; 613 A2d 242 (1992) (false exculpatory alibi of the defendant's accomplice not hearsay when offered to show similarity to the defendant's false alibi and thus their joint guilt and collusion); *Bustamante v State*, 557 NE2d 1313 (Ind, 1990) (letter from the defend-

ant's wife requesting loan from her mother admissible to show circumstantially the defendant's motive to commit arson for profit); *Jim v Budd*, 107 NM 489, 490; 760 P2d 782 (1987) ("[l]et the gates down against the chain," a command, not an assertion, and therefore not hearsay);[14] *State v Carter*, 72 Ohio St 3d 545; 651 NE2d 965 (1995) (inquiry by the defendant's accomplice asking where a gun and ammunition could be obtained not hearsay as being a question and therefore not an assertion).

Not all cases have accepted the rule definition of hearsay. Two that have similarities are *Lyle v Koehler*, 720 F2d 426 (CA 6, 1983), and *United States v Reynolds*, 715 F2d 99 (CA 3, 1983). In the former case, Lyle, the appellant, and a nontestifying codefendant,

---

[14] We recognize that out-of-court speech can constitute an assertion even if nonassertive in form. In *State v Leonard*, 243 NW2d 887, 889 (Iowa, 1976), the court held that an assault victim's testimony about a warning given to him by a third party ("Stay away from Sharen") was not hearsay, because it contained no assertion. While on its face the utterance was a command and, therefore, the kind of speech that does not ordinarily fit the rule definition of "statement," as a warning it intends to convey that Sharen is a dangerous person. If offered to prove the truth of that assertion, we would regard the evidence as hearsay. (Whether or not *State v Leonard* reached the correct result, it represents another rejection of the implied assertion theory.)

Similarly, a question, not ordinarily an assertive form of speech, might contain a de facto assertion. In an example used in Bacigal, *Implied Hearsay: Defusing the Battle Line between Pragmatism and Theory*, 11 Southern Ill U L J 1127, 1139 (1987), a prospective purchaser of drugs asks, "Is this pure heroin?", to which the declarant responds with another question, "Do cops wear blue?" The context discloses that the response, while nonassertive in form, is clearly intended as an assertion.

Nor do we suggest that there cannot be other hearsay issues regarding nonassertive conduct. Suppose the declarant clearly did not have expertise that would ordinarily be required to testify about the inference desired: "The notary public told me, 'Go get checked out for ulcerative colitis.' "

The Bacigal article is one of a number that continue the academic debate. Professor Bacigal criticizes the rule definition of hearsay for eliminating implied assertions from its scope.

Kemp, were tried jointly on charges of murder and robbery. Through Kemp's sister, the prosecutor introduced into evidence letters that Kemp had written to two acquaintances, in both of which Kemp detailed false alibis for himself and Lyle that he directed the recipients to report for them. Over a dissent, the majority of the panel held that the letters impliedly asserted what the prosecutor sought to prove, i.e., the guilt of Lyle and Kemp, and that the letters were therefore hearsay and a denial of the Sixth Amendment right of confrontation.

In *United States v Reynolds*, Parran and Reynolds were jointly tried for conspiracy to defraud, and, over the hearsay objection of Parran, a witness testified that after Reynolds was arrested he said to Parran on approaching him, "I didn't tell them anything about you." *Id.*, 100. Similarly, the panel found that conduct to be hearsay and its admission a denial of the right of confrontation.

While both the *Lyle* and *Reynolds* opinions referred to the rule definition of hearsay, neither discussed the definition of "statement" in FRE 801(a). Both opinions, moreover, placed significant reliance on views expressed in Morgan, *Hearsay Dangers and the Application of the Hearsay Concept*, 62 Harv L R 177 (1948), regarding implied assertions. Professor Morgan had modified his view, however, shortly thereafter:

> It would be a boon to lawyers and litigants if hearsay were limited by the court to assertions, whether by words or substitutes for words . . . . It would exclude evidence of a declarant's conduct offered to prove his state of mind and the facts creating that state of mind if the conduct did not

consist of assertive words or symbols. [Morgan, *Hearsay*, 25 Miss L J 1, 8 (1953).]

The hearsay conclusions of the *Lyle* and *Reynolds* courts have been considered and rejected elsewhere. *State v Esposito, supra; State v Collins, supra,* respectively. In commenting about cases reaching conclusions opposite to *Lyle* and *Reynolds,* one observer said:

> [C]ourts seem to have used the concepts of nonassertive conduct, and of assertive conduct offered to prove something other than the matter asserted, in a manner consistent with the Advisory Committee's theory that sincerity dangers are lessened. The cases generally involve utterances classed as nonhearsay that raise no real insincerity dangers affecting the purpose for which they are being used. The persons who made the intercepted calls to bookmakers are very unlikely to have been consciously plotting to incriminate the bookmakers. It is unlikely that codefendants who made false statements exculpating their accomplices were hoping to incriminate their accomplices. The makers of secret records of drug dealing and gambling are unlikely to have manufactured them and left them on the premises so they later would be used to incriminate those on the premises. This sort of frame-up possibly could occur, just as someone might frame a defendant by planting drug paraphernalia on the premises. The need for cross-examination, however, is no greater than in the case of drug books than in the case of drug paraphernalia, when the only purpose of the evidence is to show the use of the premises. Nor, finally, are declarants who create documents that later are used as indirect evidence to show association or linkage likely to have done so for purpose of falsely showing association. The person carrying another's name and phone number on a slip of paper in his or her pocket possibly might foresee that someone later could find the paper and infer that the person in possession knew the person named on the paper. The chance of this being done deliberately to create that false impression is trifling. [Park, *"I Didn't Tell Them About*

*You": Implied Assertions as Hearsay Under the Federal
Rules of Evidence*, 74 Minn L R 783, 786-787 (1990).]

After a review of the federal cases, Professor Park's
article concludes that they have reached fair results
under the rule definition of hearsay and that antici-
pated hearsay dangers have not materialized.

The dissent in *Lyle, supra*, points out the additional
difficulty presented by the majority's conclusion that
the letter requests for false alibis were hearsay
because they were offered for something asserted by
the prosecutor, i.e., the guilt of the defendants. The
"matter asserted" in the definition of hearsay has
always referred to the matter asserted by the out-of-
court declarant, not the party offering the evidence.
Indeed, if out-of-court statements were hearsay when
offered to support an assertion of the proponent of
the evidence, every such statement would be hearsay
because all of them, if not irrelevant, are offered to
prove *something*.

Although we are unaware of Michigan precedent
that discusses the "implied assertion" theory by that
name, a number of cases make clear that the theory
has already been rejected, at least regarding nonas-
sertive nonverbal conduct. Even before the effective
date of the Michigan Rules of Evidence, a majority of
participating justices said, in *People v Stewart*, 397
Mich 1, 9-10; 242 NW2d 760 (1976):

> Acts or conduct not intended as assertive are not hearsay
> and therefore, they are admissible. It should be noted that
> nonassertive acts or conduct are not an exception to the
> hearsay rule—rather, they are not hearsay in the first place.

At least three decisions since then have identified
conduct as nonhearsay for not fitting the definition of

a "statement" under MRE 801(a) as an assertion. *People v Gwinn*, 111 Mich App 223; 314 NW2d 562 (1981) (rape victim's emotional reaction to the defendant's photograph); *People v Davis*, 139 Mich App 811; 363 NW2d 35 (1984) (child victim bursting into tears when interrogated about the defendant); *People v Watts*, 145 Mich App 760; 378 NW2d 787 (1985) (mother's act of taking child to a psychologist not intended as an assertion that crimes were committed). While the cited instances involve nonverbal conduct, there is no reason for a different result in the case of nonassertive speech or when, as in the case at bar, the speech is assertive ("Alphonzo don't want you") but not offered for the truth of the assertion.

If we had the authority to engraft the "implied assertion" theory onto the definition of hearsay we would not do so. If we accept that Ms. Love was not intending to convey that the defendant was in the mood to commit assault, it seems an inordinate magnification of the remaining hearsay dangers to say that the factfinder cannot hear the evidence without cross-examining her regarding the opportunity to perceive, remember and articulate the attitude of the person sitting next to her in an automobile. If that is too obvious a case, it is also true that people do not ordinarily order drugs from places that do not sell them, place bets with persons who do not accept them, solicit perjured alibis on behalf of the guiltless, give secret reassurance to those they have never met, or, to be sure, write letters to those who cannot read them.

In any event, under the rule definition of hearsay, an "implied assertion" is a contradiction in terms and a euphemism for declining to apply the rules as they

are written. The evidence challenged here was not hearsay, and neither can it be so classified by calling it an "implied" assertion.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

SAAD, J., concurred.

O'CONNELL, P.J. (*concurring in part and dissenting in part*). I agree with the conclusion reached by the majority, but write separately to clarify certain areas where my views diverge from those of the majority.

The majority concludes that Alicia Love's statements—"Bitch come out, I'm gonna kick your ass. And Alphonzo don't want you, Alphonzo don't love you."—do not constitute hearsay.

Defendant was on trial for assaulting another individual with the intent to commit murder. To the extent that one considers, as does the majority, only the literal denotation of Love's words, that is, that Love intended to assault Christine Berry and that defendant no longer cared for Berry, they were not relevant to any fact in issue, see MRE 401, and should have been excluded.[1] To the extent that the state-

---

[1] MRE 402 provides that "[e]vidence which is not relevant is not admissible." The term "relevant evidence" is defined to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Our Supreme Court recently emphasized that "[m]ateriality, under Rule 401, is the requirement that the proffered evidence be related to 'any fact *that is of consequence*' to the action. 'In other words, is the fact to be proven truly in issue?'" *People v Mills*, 450 Mich 61, 67; 537 NW2d 909 (1995), quoting Wade & Strom, Michigan Courtroom Evidence (rev ed), Rule 401, p 71 (emphasis in *Mills*).

Here, Ms. Love's comments had no bearing on any matter that was in issue at defendant's trial. Assuming arguendo that her statements were not hearsay, they failed to make any matter that was in issue, any matter of consequence, *Mills*, *supra*, more probable or less probable than the

ments were intended to demonstrate that defendant was agitated immediately before the incident underlying his convictions (which is obviously the reason for which they were offered), the statements *were* being used to prove the truth of the matter asserted; they contained the "implied assertion" that Love, and, by association, defendant, were angry. See 2 McCormick, Evidence (4th ed), § 250, p 107. Love's statements, suggesting both that defendant did not care for Berry and that Love was angry, could constitute hearsay if admitted to demonstrate that Love was angry.[2] See

---

matter would have been in the absence of the evidence. MRE 401. Defendant's alleged acts did not stem from some *affaire de coeur* where his feelings for witness Berry would, perhaps, have been germane. And, of course, Ms. Love's feelings of hostility for witness Berry shed no light on whether defendant later committed an assault on another individual. In sum, the comments of Ms. Love did not pertain to any element of the crimes of which defendant was ultimately convicted and bore no relationship to any other pertinent matter.

That being said, I would caution that the fact that witness Berry saw defendant in the area may have been relevant evidence. However, I address only the propriety of the admission into evidence of witness Berry's reiteration of the woman's statements, as opposed to witness Berry's testimony that she saw defendant in the area. While defendant's presence may have been relevant, the statements of Ms. Love, who did not testify at trial and who made no comment incriminating defendant with respect to the charged crimes was not relevant evidence.

[2] While no Michigan case has addressed this issue, I note the following federal cases in support of my position: *Krulewitch v United States*, 336 US 440; 69 S Ct 716; 93 L Ed 790 (1949) (holding that a statement implying that the defendant was guilty of the crime for which he was on trial was inadmissible hearsay); *United States v Reynolds*, 715 F2d 99, 103 (CA 3, 1983) (implied assertions qualify as hearsay "when the matter which the declarant intends to assert is different from the matter to be proved, but the matter asserted, if true, is circumstantial evidence of the matter to be proved"); *United States v McGlory*, 968 F2d 309, 332 (CA 3, 1992), cert den 507 US 962; 113 S Ct 1388; 122 L Ed 2d 763 (1993) ("statements containing express assertions not offered for their truth may contain implied assertions that qualify as hearsay because the truth of the implied assertions is at issue and relevant to guilt"); *United States v Palma-Ruedas*, 121 F3d 841, 857 (CA 3, 1997) (statements offered to support an implied assertion are inadmissible hearsay); *Park v Huff*, 493 F2d 923, 928 (CA 5, 1974), withdrawn on other grounds 506 F2d 849 (CA 5, 1975) (en banc),

MRE 801(c). Thus, these statements should not, in my opinion, have been admitted into evidence, unless they qualified under one of the recognized hearsay

---

cert den 423 US 824; 96 S Ct 38; 46 L Ed 2d 40 (1975) (holding that "[w]hen the possibility is real that an out-of-court statement which implies the existence of the ultimate fact in issue was made with assertive intent, it is essential that the statement be treated as hearsay if a direct declaration of that fact would be so treated"); *Lyle v Koehler*, 720 F2d 426 (CA 6, 1983) (out-of-court implied utterances should be considered hearsay because of what they implied about the guilt of the defendant); *United States v Pacelli*, 491 F2d 1108 (CA 2, 1974), cert den 419 US 826; 95 S Ct 43; 42 L Ed 2d 49 (1974) (same conclusions as in *Lyle, supra*).

For other authority in support of my position, see: Seidelson, *Implied Assertions and Federal Rule of Evidence 801: A Continuing Quandary for Federal Courts*, 16 Miss C L R 33, 52-53 (1995) (concluding that implied assertions should "remain hearsay under Rule 801, thereby giving effect to the apparent congressional intent and precluding the Advisory Committee from perverting that intent by a perfunctory effect to analogize implied assertions with nonassertive conduct"); Ulam, *The Hearsay Rule: Are Telephone Calls Intercepted by Police Admissible to Prove the Truth of Matters Impliedly Asserted?*, 11 Miss C L R 349, 366 (1991) (finding that "[b]oth the direct assertion and the implied assertion contain hearsay dangers which justify the exclusion of the evidence on hearsay grounds"); Rice, *Should Unintended Implications of Speech be Considered Nonhearsay? The Assertive/Nonassertive Distinction Under Rule 801(A) of the Federal Rules of Evidence*, 65 Temp L R 529 (1992) ("regardless of whether the statement was direct or indirect (and if indirect, whether the implication was intended or not), if the evidence is logically relevant only if one believes the truth of the matter explicitly or implicitly asserted, it is hearsay"); Finman, *Implied Assertions as Hearsay: Some Criticisms of the Uniform Rules of Evidence*, 14 Stan L R 682, 691-693 (1962) (arguing that nonassertive conduct offered for the two-step inference of belief and statements offered to prove unspoken beliefs should be treated as hearsay); Fenner, *Law Professor Reveals Shocking Truth About Hearsay*, 62 UMKC L R 1, 105, n 258 (1993) (agreeing with the court in *Reynolds, supra*); Saltzburg & Redden, Federal Rules of Evidence Manual (4th ed), p 717 ("[t]o the extent that one fact must be asserted if another that is directly asserted is to be taken as true, both should be treated as hearsay when the direct assertion is offered to prove the other"); 2 Graham, Handbook of Federal Evidence (4th ed), § 801.7, pp 241-242 ("[w]hen a statement is offered to infer the declarant's state of mind from which a given fact is inferred in the form of an opinion or otherwise, since the truth of the matter asserted must be assumed in order for the nonasserted inference to be drawn, the statement is properly classified as hearsay under the language of Rule 801(c)"); 4 Louisell & Mueller, Federal Evidence, § 415, p 94, n 84 (same conclusion as in *Graham, supra*).

exceptions. To the extent that the majority concludes that an "implied assertion" is not hearsay, I respectfully disagree.[3] 3 Michigan Court Rules Practice, Evidence , § 801.2, pp 7-10.[4]

---

[3] An example of an implied assertion is the statement, "John go get your bike out of the driveway." If this "implied assertion" is offered to prove that there is a bike in the driveway, it is hearsay. (The lead opinion would conclude that this statement is not an assertion and, therefore, not hearsay). If it is offered for another relevant purpose, it may not be hearsay.

[4] "To the extent that 'questions' containing indirect assertions of fact are offered as proof of such facts (e.g., if the question 'Did you get the stuff?' is offered as a speaker's intended indirect assertion that the defendant is a drug dealer), we believe they should be categorized as 'statements' subject to the hearsay rule." 3 Michigan Court Rules Practice, Evidence, § 801.2, p 9.