*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LANTZ HOWARD WASHINGTON,

        Defendant-Appellant.

FOR PUBLICATION
December 1, 2022
9:05 a.m.

No. 353052
St. Clair Circuit Court
LC No. 19-002078-FH

Before: GLEICHER, C.J., and MARKEY and PATEL, JJ.

GLEICHER, C.J.

The Sixth Amendment's Confrontation Clause prohibits the admission of a testimonial statement made by an unavailable witness unless the witness was previously made available for cross-examination. The question presented is whether evidence implicitly introducing an unavailable witness's testimonial statement is similarly precluded.

A Canadian Customs and Border Service Agency (CBSA) agent, Officer Matthew Lavers, arrested Lantz Washington after Washington avoided paying the Blue Water Bridge toll in Port Huron. Lavers brought Washington back to the American side of the bridge and reported that Washington was wearing a bulletproof vest under his shirt. The prosecution charged Washington with being a violent felon in possession of body armor contrary to MCL 750.227g.

Lavers did not testify at Washington's trial and was never offered for cross-examination. The prosecution circumvented this Confrontation Clause problem by questioning a United States Customs and Border Protection officer about his "communications" with Lavers. Through this questioning, the prosecution effectively admitted Lavers' unconfronted testimony that Washington possessed the body armor.

Lavers was the only witness who could connect Washington to the body armor, and thus a witness whom Washington had a constitutional right to confront. Because the error in allowing another witness to establish Washington's guilt was not harmless beyond a reasonable doubt, we vacate Washington's conviction and remand for a new trial.

## I. THE TRIAL EVIDENCE

Washington crossed the Blue Water Bridge from Port Huron, Michigan, into Canada without paying the toll. The toll collector, Denise Fenner, recounted that a vehicle "actually blew through my lane." Fenner could not see the vehicle's occupant or discern whether the driver was male or female. From her vantage point, Fenner admitted, she would not have been able to tell if the driver wore a bulletproof vest. Video evidence revealed that the driver wore red clothing and drove a Ford pickup truck. Fenner reported the event to her supervisor.

Paul Stockwell, a supervisory officer with United States Customs and Border Protection, supplied the testimony needed to convict Washington: that Washington was in possession of a body armor. Stockwell explained that he met Officer Lavers and a crew of CBSA officers on the American side of the bridge. They had Washington in a police cruiser. Stockwell's observation of Washington in the Canadian police cruiser was his only relevant first-hand observation.

Because Lavers' did not appear at the trial, the prosecution relied on the following testimony by Officer Stockwell to establish Washington's possession of the vest:

> *Q*. . . . Who gave you custody of [Washington] . . . ?
>
> *A*. I, I don't know which specific CBSA officer turned him over to us. We actually, me and the guys that work with me, took him out of the cruiser. So, he was in the back.
>
> *Q*. Okay, so a collective group of you?
>
> *A*. There was.
>
> *Q*. Okay.
>
> *A*. There was about six of us.
>
> * * *
>
> *Q*. At some point did Officer Lavers from the Canadian services hand you any other evidence?
>
> *A*. Yes, he did.
>
> *Q*. What did he hand you?
>
> * * *
>
> *A*. A body armor.
>
> * * *
>
> *Q*. Now, without saying anything about what was said, the only question I have for you is *were there communications between you and Officer Lavers*?

*A.* There were.

*Q.* Okay. *And . . . based on those communications you took custody of [Washington]?*

*A*: Yes, we did.

*Q.* And you took possession of the body armor that was turned over at the same time?

*A.* Yes, sir. [Emphasis added.]

On cross-examination, Officer Stockwell acknowledged that Washington was not wearing the bulletproof vest when he took him into custody, that he never saw Washington wearing the vest, that he did not witness the vest being removed from Washington's person or possession, and that he had no direct personal knowledge that Washington had ever possessed the vest. The questioning concluded:

*Q.* So would it be fair to summarize, Officer, you have no direct knowledge of Mr. Washington having possession of [the body armor], seeing him in possession of it in any . . . way, shape or form; is that correct?

*A.* No direct knowledge.

Officer Stockwell transferred custody of Washington to Port Huron Police Officer Kyle Whitten. Whitten took Washington to the St. Clair County Jail, where he "overheard [Washington] say that he was wearing the body armor because he was afraid people were going to kill him." Like Stockwell, Whitten conceded on cross-examination that he did not have any personal knowledge that Washington had worn or possessed the body armor.

Port Huron Police Officer Ernesto Fantin authenticated a jailhouse recording of a phone call from Washington to his mother. During the call, Washington stated that "James" gave him a bulletproof vest and he "put on the bulletproof vest." The transcribed call continued, "And I went to the police with it on. I was [in] fear for my life, they was threatening me."

Washington testified on his own behalf and denied having made the statement attributed to him by Whitten. He otherwise claimed that he could not recall or remember whether he possessed or wore the bulletproof vest.

The jury found Washington guilty as charged.

## II. ANALYSIS

### A. HEARSAY AND THE CONFRONTATION CLAUSE

The United States Constitution provides, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" US Const, Am VI. Under the Michigan Constitution, "[i]n every criminal prosecution, the accused shall have the right . . .

to be confronted with the witnesses against him or her[.]" Const 1963, art 1, § 20. "The right of confrontation insures that the witness testifies under oath at trial, is available for cross-examination, and allows the jury to observe the demeanor of the witness." *People v Yost*, 278 Mich App 341, 370; 749 NW2d 753 (2008) (quotation marks and citations omitted). A witness's testimony incriminating a defendant is inadmissible at a trial unless the witness is present for cross-examination or previously submitted to cross-examination by the defendant. *Melendez-Diaz v Massachusetts*, 557 US 305, 309; 129 S Ct 2527; 174 L Ed 2d 314 (2009).

Washington challenges the following portion of the prosecutor's exchange with Officer Stockwell on Confrontation Clause grounds:

> *Q*. At some point did Officer Lavers from the Canadian services hand you any other evidence?
>
> *A*. Yes, he did.
>
> *Q*. What did he hand you?
>
>     *   *   *
>
> *A*. A body armor.
>
>     *   *   *
>
> *Q*. Now without saying anything about what was said, the only question I have for you is *were there communications between you and Officer Lavers*?
>
> *A*. *There were*.
>
> *Q*. Okay. *And . . . based on those communications you took custody of [Washington]*?
>
> *A*. *Yes, we did*.
>
> *Q*. *And you took possession of the body armor that was turned over at the same time?*
>
> *A*. *Yes, sir*. [Emphasis added.]

Our Confrontation Clause analysis of this testimony requires two inquiries: was Lavers "(1) . . . a 'witness against' the accused under the Confrontation Clause; and (2) if so, has the accused been afforded an opportunity to 'confront' that witness under the Confrontation Clause?" *People v Fackelman*, 489 Mich 515, 562; 802 NW2d 552 (2011). The first question concerns whether Stockwell's questioning introduced a "testimonial" statement. A testimonial statement is one made for an evidentiary purpose. *Crawford v Washington*, 541 US 36, 51; 124 S Ct 1354; 158 L Ed 2d 177 (2004). *Crawford* instructs that for Confrontation Clause purposes, testimonial statements are those in which witnesses " 'bear testimony' " against an accused. *Id*. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of

establishing or proving some fact." *Id*. (cleaned up.) The United States Supreme Court has characterized the exclusion of testimonial hearsay as the "primary object" of the Sixth Amendment. *Id*. 53. "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id*. at 68-69.

Lavers' "affirmation" that Washington was wearing the body armor, communicated through Stockwell, was testimonial. Lavers told Stockwell about the body armor "to establish or prove past events potentially relevant to later criminal prosecution." *Davis v Washington*, 547 US 813, 822; 126 S Ct 2266; 165 L Ed 2d 224 (2006). Had the prosecutor simply asked Stockwell, "what did Officer Lavers tell you about the body armor," it is easy to conclude that the Confrontation Clause would have prohibited an answer (and undoubtedly, that is the reason the prosecutor did not ask that question).

But Stockwell's trial testimony conveyed precisely the same information: that Washington had been wearing the body armor when caught by the Canadian authorities. Either recapitulated directly as a statement made by Lavers to Stockwell, or through the implied method used at the trial, *Lavers* was the source of the incriminatory assertion that Washington possessed the body armor. Stockwell was not personally involved in Washington's arrest on the Canadian side of the bridge. He had no reason to know, or even to suspect, that Washington was wearing body armor until he spoke to Lavers. Stockwell relayed to the jury the *substance* of Lavers' out-of-court report and the prosecutor introduced this evidence to prove its truth: that Washington possessed the body armor.

Lavers' assertion of Washington's guilt was incorporated within Stockwell's testimony through an indirect method that checks all the boxes as unconfronted testimonial hearsay: an out-of-court assertion, testimonial in nature, admitted for its truth. Stockwell did not explicitly state that Washington was wearing the vest, but his testimony contained an implicit accusation that he was. And Lavers was Washington's accuser, not Stockwell, despite that Lavers' actual words were never revealed to the jury. Because Lavers never testified, the answer to the second *Fackelman* inquiry is obvious: Washington did not have an opportunity to confront Lavers.

The remaining question is whether the United States and Michigan Constitutions permit the introduction of this implied hearsay testimony.

Other courts have referred to similar end-runs around the Confrontation Clause as the elicitation of implied hearsay. For example, in *Mason v Scully*, 16 F3d 38 (CA 2, 1994), the prosecutor questioned a detective about a conversation the detective had with an armed robbery suspect (George Rivera), who was unavailable to testify at the defendant's trial:

> "*Q*. And, after the lineup . . . was a conversation held with George Rivera? This is a yes or no question.
>
> *A*. Yes.
>
> *Q*. And, after this conversation with George Rivera, were you looking for somebody?

*A.* Yes, I was.

*Q.* And who were you looking for?

*A.* [The defendant] Terrence Mason." [*Id.* at 40.]

The United States Court of Appeals for the Second Circuit held that the admission of this testimony violated the defendant's right to confront Rivera, whose statement was implicitly introduced through the detective. The Court explained, "To implicate the defendant's confrontation right, the statement need not have accused the defendant explicitly but may contain an accusation that is only implicit." *Id.* at 42-43. That the precise content of Rivera's statement was never revealed was "immaterial," the Court continued, "for the plain implication that the prosecutor sought to elicit, and emphasized in his summation, was that the conversation with Rivera led the police to focus on Mason." *Id.* at 43.

The Second Circuit considered the same legal issue in *Ryan v Miller*, 303 F3d 231 (CA 2, 2002), which arose from the murder of a young boy. Four teenagers were suspected of having killed the child. Detectives questioned many witnesses and possible suspects, narrowing down the potential defendants to Peter Quartararo and three others. *Id.* at 234-235. Detective Palumbo questioned Quartararo while detectives Gill and Reck questioned Thomas Ryan and Robert Brensic. *Id.* at 235. The prosecutor elicited the following testimony from Sergeant Jensen, who oversaw the investigation:

"*Q.* And did something happen at 4:30?

*A.* Yes, there did.

*Q.* What?

*A.* I received a phone call from Detective Palumbo.

*Q.* Did you then have a conversation with Detective Palumbo on the telephone at about 4:30?

*A.* Yes, I did.

*Q. Now, as a result of talking with Detective Palumbo at 4:30, did you do something with respect to Gill and Reck?*

*A. Yes, I did.*

*Q. What was that?*

*A. I directed Gill and Reck to advise Tom Ryan and Robert Brensic of their rights.*"

*[Defense Counsel].* I'm going to object.

*The court.* No overruled.

*Q. As to what charge?*

*A. Murder.*" [*Id.* at 241.]

The opinion details additional testimony given by the detectives referencing other conversations and inculpatory actions taken after conversations with suspects who confessed (and who did not testify), such as reading another suspect his *Miranda*[1] rights. *Id.* at 241-244.

The Court characterized the objectionable content of the testimony as "accusatory assertions introduced without the testimony of the accuser" in violation of the Confrontation Clause. *Id.* at 247. Recalling *Mason*, the Court reasoned, "Testimony need not contain an explicit accusation in order to be excluded as a violation of the Confrontation Clause," and admonished that "it is well established in this Circuit that lawyers may not circumvent the Confrontation Clause by introducing the same substantive testimony in a different form." *Id.* at 248.

Other Courts have analyzed similar efforts to avoid the Confrontation Clause and have reached the same conclusion. In *United States v Kizzee*, 877 F3d 650, 653 (CA 5, 2017), a case resembling ours, the prosecutor questioned a detective "about questions he posed to a criminal suspect, Carl Brown, during an interrogation." Brown did not testify. Here is the colloquy:

"*Prosecutor.* Detective Schultz, did you ask Mr. Brown a series of questions after you arrived at the police department?

*[Schultz].* Yes, sir, I did.

*Prosecutor.* Did you ask Mr. Brown whether or not he obtained the narcotics that were discovered in his hat from Pereneal Kizzee?

*[Schultz].* Yes, sir, I did.

*Prosecutor.* Did you ask him if he obtained the narcotics that were discovered in his hat immediately prior to being stopped?

*[Schultz].* Yes, sir.

*Prosecutor.* Did you ask Mr. Brown whether or not he had seen any additional narcotics at 963 Trinity Cut Off?

*[Schultz].* Yes.

\* \* \*

*Prosecutor.* Did you ask him whether or not he obtained drugs from Mr. Kizzee on previous occasions?

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

*[Schultz]*.  Yes, sir.

*Prosecutor*.  Based on your observations the day before that involved the surveillance at Mr. Kizzee's residence, the stop by Officer Taylor [Wilkins], the discovery of narcotics, and your subsequent interview of Mr. Brown, what did you and Detective Lehman do?

*[Schultz]*.  I was able to obtain a search warrant for 963 Trinity Cut Off." [*Id*. at 655 (alterations altered).]

The United States Court of Appeals for the Fifth Circuit vacated Kizzee's conviction on Confrontation Clause grounds, explaining:

This Court has recognized that police testimony about the content of statements given to them by witnesses are testimonial under *Crawford*; officers cannot refer to the substance of statements made by a nontestifying witness when they inculpate the defendant.  Where an officer's testimony leads to the clear and logical inference that out-of-court declarants believed and said that the defendant was guilty of the crime charged, Confrontation Clause protections are triggered. [*Id*. at 657 (cleaned up).]

The detective's testimony was inadmissible because it allowed the jury "to reasonably infer the defendant's guilt," the Court continued, based on testimonial statements made to the officer by nontestifying witnesses.  *Id*.  See also *Young v United States*, 63 A3d 1033 (US App DC, 2013); *United States v Meises*, 645 F3d 5, 21 (CA 1, 2011) ("[I]f what the jury hears is, in substance, an untested, out-of-court accusation against the defendant, particularly if the inculpatory statement is made to law enforcement authorities, the defendant's Sixth Amendment right to confront the declarant is triggered.").

Michigan has not yet officially weighed in on the evidentiary and constitutional issues presented here. We find the federal implied hearsay cases cited in this opinion persuasive and consistent with our State's Confrontation Clause jurisprudence.  Evidence directly implying the substance of a testimonial, out-of-court statement made by an unavailable witness and offered to prove its truth is inadmissible because it violates the Sixth Amendment of the United States Constitution, and Article 1, § 20 of Michigan's Constitution.

Contrary to our dissenting colleague's position, this Court's decision in *Jones (After Remand)*, 228 Mich App 191, is neither dispositive of nor relevant to the evidentiary issue now before us. *Jones* involved only a hearsay question and not a Confrontation Clause issue.  A witness testified to having heard another witness shout, " 'Bitch come out, I'm gonna kick your ass.  And Alphonzo don't want you, Alphonzo don't love you.' "  *Id*. at 203.  The defendant objected solely on hearsay grounds.  This Court held that the first phrase ("Bitch come out") was not a "statement" for hearsay purposes because it "contains no assertion.  It is incapable of being true or false.  It is a command, not an assertion[.]"  *Id*. at 204-205.  The remainder of the testimony was assertive, this Court observed, but was not offered to prove its truth.  *Id*.  Rather, the words were offered "as an integral part of the series of events that led to the shooting of the victim" and "a component of the threat" made to another witness.  *Id*. at 205.

The dissenter in *Jones* maintained that the words contained an "implied assertion" that the speaker was angry, and therefore qualified as hearsay. *Id*. at 227 (O'CONNELL, J., dissenting). The majority rejected the dissent's version of the "implied assertion" theory, defining the concept as follows:

> The use of the term "implied assertion" to denote hearsay has occurred in situations where out-of-court conduct of a person, sometimes verbal and sometimes nonverbal, is offered in evidence to demonstrate that person's belief, from which the inference is offered that the belief is true, *when it was not the actor's intent to communicate the matter to be proved in court*. And so, to use a famous example, if the issue were the seaworthiness of a ship, evidence that the ship captain sailed away with his family aboard after making a thorough inspection of the ship would be considered hearsay as being the captain's implied assertion that the ship was seaworthy. [*Id*. at 207-208 (emphasis added).]

Stockwell's recount of his conversation with Lavers does not fall within this definition of an "implied assertion" because it *was* offered to prove Lavers' intent "to communicate the matter to be proved in court." Unlike an "implied assertion," the term used in *Jones*, the substance of Lavers' conversation with Stockwell on the Blue Water Bridge—that Washington had the body armor in his possession—was offered by the prosecution to prove its truth. And when Lavers handed over Washington and the vest to Stockwell, Lavers made a statement that he intended as accusatory. Unlike the witness quoted in *Jones*, Lavers meant to "bear testimony" against Washington, thereby situating the statement squarely within the definition of unconfronted hearsay. See *Fackelman*, 489 Mich at 515 ("And we understand from the constitution that the right of confrontation is concerned with a specific type of out-of-court statement, i.e., the statements of 'witnesses,' those people who bear testimony against a defendant.").

Notably, the defendant in *Jones* did not challenge the admission of the statements on Confrontation Clause grounds; that case was decided six years before *Crawford*. Through *Crawford*'s lens, the statements would have been admissible because they were not testimonial. The evidence being conveyed was the speaker's state of mind rather than an accusation. *Jones* and its newest progeny, *People v Propp (on Remand)*, ___ Mich App ___; ___ NW2d ___ (2022) (Docket No. 343255), involve communications that were neither hearsay nor testimonial, and lack any relevance here.

We also respectfully disagree with our dissenting colleague's view that the "communication" testimony elicited from Stockwell was intended only to explain why Stockwell took Washington into custody and not to prove that Washington possessed the body armor. Stockwell took Washington into custody because Washington was in possession of body armor. That fact was personally unknown to Stockwell until Lavers shared it. The reason that Stockwell took Washington into custody is logically and legally inextricable from the out-of-court accusation made by Lavers that Washington was wearing the body armor when arrested in Canada. The "explanation" for Stockwell's conduct is relevant only because it inculpated Washington.

The prosecutor asked Officer Stockwell three questions critical to proving Washington's guilt: whether he had "communications" with Lavers, whether "based on those communications [he] took custody of [Washington]," and whether he "took possession of the body armor that was

turned over at the same time." Implicit within Stockwell's answers is Lavers' out-of-court statement that Washington possessed the body armor when he was arrested. Absent this implied testimonial hearsay, the prosecutor could establish only one crime: jumping the toll. Stockwell did not recount the exact words the two shared, but the substance of Lavers' communication was obvious, and the reason for its introduction was to prove that Washington was wearing the body armor when stopped by the Canadian authorities rather than to explain why he was taken into custody.

Permitting the prosecution to "weav[e] an unavailable declarant's statements into another witness's testimony by implication" violates the Confrontation Clause. *Meises*, 645 F3d at 22. Stockwell's testimony regarding his "communications" with Lavers therefore violated Washington's Sixth Amendment right to confront Lavers. We turn to a discussion of the appropriate remedy for this constitutional violation.

## B. PRESERVATION AND OUR STANDARD OF REVIEW

On the morning of the trial, Washington moved in limine to exclude from the trial evidence the bulletproof vest and the recorded jailhouse phone call. Defense counsel maintained that the prosecution could establish an evidentiary foundation for the introduction of the bulletproof vest, "the corpus delicti itself," only through testimony that would violate the Confrontation Clause. Counsel contended, "And if you read *Crawford [v] Washington*, I don't think anyone can doubt having read that wonderful opinion by Justice Scalia that if you don't have the ability to cross examine the real witness, . . . the only one who saw you do anything, you're being denied your right to a fair trial and there's a Sixth Amendment violation." Regarding Washington's alleged statements at the jail and during the phone call, counsel invoked the "rule of corpus delicti."

The trial court denied the motion, but it precluded Officer Stockwell from testifying to any statements made by Officer Lavers. The court explained, "[H]e can say factually I received this from a Canadian Customs officer at the same time I received the Defendant, as well as his truck was turned over. That then is okay. You've got those circumstances."

Counsel also pointed out that Washington had been deemed incompetent to stand trial following a forensic examination conducted approximately two weeks after his arrest, and moved to exclude his statements on voluntariness grounds. Washington was only later deemed competent to stand trial. The court denied that motion, too.

We review de novo whether a defendant's Sixth Amendment right of confrontation has been violated. *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018). Because the Confrontation Clause error was preserved by an appropriate objection, we must determine whether the beneficiary of any error has established that the error was harmless beyond a reasonable doubt. *People v Sammons*, 505 Mich 31, 56; 949 NW2d 36 (2020). This analysis requires us to assess "the probable effect of that testimony on the minds of an average jury." *Id*. (quotation marks and citation omitted). "Reversal is required if the average jury would have found the prosecution's case significantly less persuasive without the erroneously admitted testimony" of Officer Stockwell, and the introduction of the body armor. *Id*. (quotation marks and citation omitted). This analysis requires us to consider the remainder of the prosecution's case.

## C.  THE APPROPRIATE REMEDY

The prosecution has not demonstrated that the error in this case was harmless beyond a reasonable doubt.  The primary evidence linking Washington to the body armor was provided by Stockwell's inadmissible testimony conveying Lavers' statements.  Through Stockwell, the prosecution admitted the vest into evidence and connected it to Washington.  Absent Stockwell's testimony regarding the substance of his "communications" with Lavers, the prosecution would have lacked any testimony that could serve as a foundation for the vest's admission, to establish the chain of custody, or to prove that a crime had been committed.

The additional evidence linking Washington to the body armor consisted of Washington's alleged jailhouse confession (overheard by an officer), and the recorded telephone conversation with his mother explaining that "James" gave him the vest and he "put it on" because he "was [in] fear for my life, they was threatening me."  But without Stockwell's prohibited testimony, the prosecution would have been unable to introduce the vest into evidence. Given that evidentiary vacuum, Washington's statements would have been inadmissible under the corpus delicti rule.

"In Michigan, it has long been the rule that proof of the corpus delicti is required before the prosecution is allowed to introduce the inculpatory statements of an accused."  *People v McMahan*, 451 Mich 543, 548; 548 NW2d 199 (1996).  The "corpus delicti" rule originally applied only to homicide cases, but Michigan applies the rule to other crimes as well.  *People v Cotton*, 191 Mich App 377, 384-387; 478 NW2d 681 (1991).

> In defining the concept of corpus delicti, Wigmore notes that an analysis of every crime reveals three components: (1) the occurrence of the specific injury or loss; (2) some person's criminality as the cause of the loss; and (3) the accused's identity as the perpetrator of the crime.  In its strictest sense, the term "corpus delicti" refers only to the first of these elements.  For example, the corpus delicti of homicide is the fact of death.  However, most courts also have included the second element, someone's criminality.  On the other hand, most courts have held that the accused's identity as the perpetrator of the crime is not an element of the corpus delicti.  [*Id.* at 386.]

Without direct or circumstantial evidence that Washington possessed the vest, the prosecution had no evidence that any crime had been committed.  Likely the prosecution was aware of this problem and questioned Stockwell regarding his "communications" with Lavers in an attempt to work around it.  Regardless, we cannot conclude beyond a reasonable doubt that Washington would have been convicted had the inadmissible testimony been excluded.

We vacate Washington's conviction and remand for a new trial.  We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Sima G. Patel

-11-