*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JOHN STANTON and ROBIN STANTON,

Plaintiffs-Appellants,

v

ANCHOR BAY SCHOOL DISTRICT, LEONARD
WOODSIDE, and SHERRY KENWARD,

Defendants-Appellees.

UNPUBLISHED
February 21, 2023

No. 358408
St. Clair Circuit Court
LC No. 18-000314-CK

Before: CAVANAGH, P.J., and SERVITTO and GARRETT, JJ.

PER CURIAM.

This intentional tort case is before this Court for the second time. In the first appeal, defendant Sherry Kenward challenged the trial court's denial of her motion for summary disposition on the basis of governmental immunity.[1] This Court affirmed, agreeing that there were questions of fact regarding Kenward's entitlement to immunity. *Stanton v Anchor Bay Sch Dist*, unpublished per curiam opinion of the Court of Appeals, issued January 7, 2020 (Docket No. 345110). After discovery, the trial court granted Kenward's second motion for summary disposition. Plaintiffs, John Stanton (Stanton) and Robin Stanton (Robin), appeal as of right. Finding no error requiring reversal, we affirm.

## I. FACTUAL BACKGROUND

This action arises from plaintiffs' resignations from their respective positions with defendant Anchor Bay School District (ABSD). Stanton was principal at the Anchor Bay High School, and Robin was principal at Anchor Bay Middle School. Approximately two years before the events at issue in this case, Stanton and Patricia Mikolowski, a security guard at the high school, confiscated a wooden penis from a student. According to Stanton, he and Mikolowski regularly joked about the incident thereafter. After Mikolowski accepted a position at the middle school in

---

[1] The trial court granted summary disposition as to defendants Anchor Bay School District and Leonard Woodside, and that decision was not challenged.

May 2017, Stanton, Mikolowski, and several other employees gathered to celebrate Mikolowski's last day. During the gathering, Stanton presented the wooden penis to Mikolowski as a gift. Stanton also signed it and added the inscription, "Hope your job isn't too hard!"

Sometime after the farewell party, Kenward, the director of student services, received an anonymous complaint describing Stanton's gift and indicating that the writers found "it offensive and disgusting that the High School Principal would do something like this." Kenward reported the complaint to the superintendent, defendant Leonard Woodside, who told Kenward to interview Mikolowski. In pertinent part, Kenward's notes from her meeting with Mikolowski reflect the following:

> Pat said to me that everybody was laughing at her. Pat shared with me that she cried the entire weekend. She kept telling me how embarrassed she was with the wooden penis and how uncomfortable she felt. Pat kept crying over and over and I couldn't get her to stop crying when I spoke with her.

> Pat also shared with me that she couldn't believe how rude Mr. Stanton was to her the last day of work. Pat said that Mr. Stanton barked orders all day long at her. Pat said "this is why I am leaving the high school because I get no respect."

> Pat's major concern is she is very afraid to take the new custodial promotion at Middle School North because she is afraid that [Robin] will target her and bully her like she does to her other staff. Pat said that [Robin] acts like a princess, but is a bitch.

> Pat also mentioned that she knows how [Robin] operates because she retaliates against the staff that complain about her.

> Pat shared with me that when she saw the wooden penis it was like a "F[***] You" on the way out.

Kenward's summary of the incident was reflected in Stanton's annual performance evaluation. Woodside advised Stanton that he intended to file charges regarding the sexual harassment complaint with the Board of Education unless Stanton resigned within 24 hours. Additionally, if Stanton did not resign, his performance evaluation describing the sexual harassment investigation would become a matter of public record. Stanton tendered his official resignation in June 2017.

Stanton began interviewing for the principal position at Churchill High School in Livonia in June 2017. Stanton's ABSD supervisor provided a favorable review, and Stanton was hired. But a few days later, Livonia School District (LSD) received an anonymous tip indicating that Stanton was the subject of a sexual harassment complaint during his tenure at Anchor Bay High School. Stanton resigned at LSD's request.

Robin also received a negative performance evaluation for that school year. She went on medical leave from her position with ABSD around the same time Stanton was dealing with the repercussions of his gift, eventually resigning in 2018.

In the wake of Stanton's resignation from ABSD, Mikolowski contacted him to explain that she did not file a complaint, but Kenward called Mikolowski into the office and interrogated her about the wooden penis. Stanton recalled that Mikolowski said she was very upset during the interrogation, but she was not offended by the gift, and she denied saying the things that appeared in his performance evaluation.

Plaintiffs sued ABSD, Woodside, and Kenward, but only their claims against Kenward are at issue in this appeal. With respect to Kenward, plaintiffs sought damages for defamation, intentional infliction of emotional distress, tortious interference with plaintiffs' ABSD employment contracts, and tortious interference with Stanton's LSD employment contract. As noted earlier, the trial court granted summary disposition of all plaintiffs' claims. The court reasoned that there was no evidence that Kenward did anything to interfere with Stanton's LSD contract, and Kenward could not interfere with plaintiffs' ABSD contracts when she was carrying out her duties as an ABSD employee. Concerning plaintiffs' claim for intentional infliction of emotional distress, the court held that the facts did not establish extreme and outrageous conduct. Turning to plaintiffs' defamation claim, the court reasoned that regardless of whether it focused on the elements of defamation, common-law privilege, or governmental immunity, the absence of evidence that Kenward acted with malice or did not act in good faith was dispositive. The defamation claim also failed because Kenward's communications with Woodside and others "that she was required to share that information with" did not constitute publication. The court further concluded that all the claims were "permeated with the qualified immunity that [Kenward] enjoys because I have seen nothing that would indicate that she was acting with the reckless degree of bad faith to where she would lose that . . . ."

## II. STANDARDS OF REVIEW

A trial court's summary disposition ruling is reviewed de novo on appeal. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). Summary disposition on the basis of governmental immunity is governed by MCR 2.116(C)(7). *Petipren v Jaskowski*, 494 Mich 190, 201; 833 NW2d 247 (2013). A party moving for summary disposition under subrule (C)(7) may, but is not required to, support the motion with "affidavits, depositions, admissions, or other documentary evidence provided that the 'substance or content' of the supporting proofs is admissible as evidence." *Id*. This Court accepts the factual allegations of the complaint as true unless contradicted by other evidence. *Id*. "When the material facts are not in dispute, this Court may decide whether a plaintiff's claim is barred by immunity as a matter of law." *Id*.

MCR 2.116(C)(10)[2] tests the factual sufficiency of a claim. *El-Khalil*, 504 Mich at 160. The standard of review for dispositive motions brought under MCR 2.116(C)(10) is well settled:

---

[2] Kenward moved for summary disposition under MCR 2.116(C)(7), (8), and (10). But only Kenward's governmental immunity argument implicated a defense outlined in subrule (C)(7), and the parties relied on evidence outside the pleadings. Consequently, review of plaintiffs' claims of error regarding issues other than governmental immunity is appropriate under MCR 2.116(C)(10). See *Auto-Owners Ins Co v Campbell-Durocher Group Painting & Gen Contracting, LLC*, 322 Mich App 218, 224; 911 NW2d 493 (2017).

> In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Trueblood Estate v P&G Apartments, LLC*, 327 Mich App 275, 284; 933 NW2d 732 (2019) (quotation marks and citation omitted).]

"A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *El-Khalil*, 504 Mich at 160 (quotation marks and citation omitted).

## III. GOVERNMENTAL IMMUNITY

Plaintiffs argue on appeal that the trial court erred by granting summary disposition on the basis of governmental immunity because Kenward knowingly lied and, therefore, was not acting in good faith. We disagree.

The governmental tort liability act, MCL 691.1401 et *seq.*, affords absolute immunity for high-ranking government officials. *Odom v Wayne Co*, 482 Mich 459, 469; 760 NW2d 217 (2008). Other governmental employees, on the other hand, may be held liable for intentional torts in accord with the common law, which provides only qualified immunity with respect to intentional torts. *Id*. at 470, 473. Qualified immunity will shield a government employee from liability only if

> (a) [t]he acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,

> (b) the acts were undertaken in good faith, or were not undertaken with malice, and

> (c) the acts were discretionary, as opposed to ministerial. [*Id*. at 480.]

The defendant bears the burden of proving his or her entitlement to qualified immunity. *Id*. at 479.

Plaintiffs argue that Kenward is not entitled to governmental immunity because she acted with malice when she knowingly lied, telling ABSD administrators that Mikolowski complained of sexual harassment and mistreatment by Stanton. Thus, only the second element for qualified immunity is at issue. In support of their claim of error, plaintiffs rely on the definition of "actual malice" established in *New York Times Co v Sullivan*, 376 US 254, 279-280; 84 S Ct 710; 11 L Ed 2d 686 (1964), wherein the United States Supreme Court held that a public official may only recover damages for defamation relating to official conduct upon proof that the defamatory statement "was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Plaintiffs contend that because Kenward knowingly lied, her actions fall squarely within this definition of malice, which precludes governmental immunity. Assuming, without deciding, that this definition of malice applies to a

claim of qualified governmental immunity, the trial court did not err by concluding that Kenward was entitled to governmental immunity.[3]

Kenward provided a sworn statement declaring that she "endeavored to be 100% accurate" when she summarized her interview with Mikolowski and that if any inaccuracies existed, they were "minor and unintentional." Mikolowski reviewed Kenward's summary in January 2018 and verified its accuracy, with the exception of five sentences that she could not, "to the best of [her] recollection," remember saying. Specifically, Mikolowski could not recall saying (1) that she cried the entire weekend; (2) "how embarrassed she was with the wooden penis and how uncomfortable she felt"; (3) that Robin acted "like[] a princess, but is a [*****],"; (4) that when staff complained about Robin, Robin would retaliate against them; and (5) that she saw Stanton's gift as a " 'F[***] You' on the way out." In her most recent affidavit, Mikolowski clarified that while she could not specifically confirm saying the foregoing things, neither could she dispute saying them. She simply did not know.

Kenward reasons that Mikolowski's uncertainty leaves plaintiffs unable to negate the good-faith requirement for qualified immunity. Plaintiffs, on the other hand, maintain that Mikolowski's first affidavit executed in 2018 establishes a question of fact as to whether Kenward knowingly

---

[3] Malice is a legal term of art that has acquired several distinct meanings depending on the context in which it is used, *Feyz v Mercy Mem Hosp*, 475 Mich 663, 683; 719 NW2d 1 (2006), and plaintiffs have not cited any authority applying the *New York Times* definition of actual malice for purposes of governmental immunity. While that definition has apt application in this case, it would not universally apply to all qualified governmental immunity claims.

In *Odom*, the Supreme Court indicated that "there is no immunity when the governmental employee acts *maliciously* or with a *wanton or reckless disregard of the rights of another*." *Odom*, 482 Mich at 474. It also cited precedent regarding willful misconduct, noting:

> "[W]illful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does." Similarly, our standard civil jury instructions define "willful misconduct" as "conduct or a failure to act that was intended to harm the plaintiff" and "wanton misconduct" as "conduct or a failure to act that shows such indifference to whether harm will result as to be equal to a willingness that harm will result." These instructions are consistent with the negation of the common-law definition of "good faith" and can be a useful guide for a trial court considering a defendant's motion for summary disposition based on individual governmental immunity. Thus, the proponent of individual immunity must establish that he acted without malice. [*Id*. at 475 (citations omitted).]

Whether the definition advanced by plaintiffs should be applied to the second element of qualified governmental immunity is immaterial in this instance because, assuming plaintiffs can present evidence suggesting that Kenward made statements that were knowingly false or with reckless disregard of their truth or falsity, that same evidence would be consistent with the negation of good faith discussed in *Odom*.

-5-

lied about the meeting. In pertinent part, the 2018 affidavit confirmed that Stanton presented Mikolowski with the wooden penis and Mikolowski accepted it, finding it funny that Stanton still had the item years after it had been confiscated. Mikolowski denied complaining about the gift and explained that she "was not offended and even went home and showed my family," who "all thought it was funny." Concerning her interactions with plaintiffs in general, Mikolowski indicated that Stanton was the best principal she ever worked for, and she was never mistreated by or complained about Robin.

Reconciling Mikolowski's various statements, the trial court opined that Mikolowski's statements were not inconsistent. Instead, the court inferred that Mikolowski was likely upset by "the whole thing," but did not want to be perceived as "the bad guy," nor did she want Stanton to be punished for his gift. Although Mikolowski's 2018 affidavit is certainly favorable to plaintiffs' position, we conclude that it does not establish that the unverified statements were falsely reported.

For purposes of plaintiffs' claims, the most significant of the unverified statements is undoubtedly Kenward's assertions that Mikolowski "kept telling me how embarrassed she was with the wooden penis," "how uncomfortable she felt," and that she cried all weekend. Nothing about Mikolowski's 2018 affidavit actually contradicts these assertions. While plaintiffs suggest that Mikolowski found the gift funny, her first affidavit actually states that she "thought it was funny that [Stanton] still had" the wooden penis, that she was not "offended" by it, and that her family thought it was funny. It is not difficult to imagine that Mikolowski may have been embarrassed and uncomfortable when she found herself at the center of a bawdy joke that caused her coworkers to laugh at her, even if she did not personally find the gift offensive. Mikolowski also recalled that she cried when she turned over the gift to Kenward after the initial interview, telling Kenward that she did not want Stanton to get in trouble and had "no issues" with the gift. Stanton testified that Mikolowski said she wept profusely during the meeting with Kenward, though he attributed her emotional state to discomfort with Kenward's investigation. Mikolowski's most recent statement explained that the emotionally difficult nature of the situation left her unable to remember the details of what she said to Kenward. It is plain that Mikolowski was upset by the entire situation, causing her to cry on more than one occasion.

The next two unverified statements related to Robin. Although Mikolowski could not specifically recall making most of the statements regarding Robin, the statement she *did* recall is particularly noteworthy. Mikolowski confirmed the portion of Kenward's summary that said, "[Mikolowski's] major concern is she is very afraid to take the new custodial position at Middle School North because she is afraid that [Robin] will target her and bully her like she does to her other staff." The other statements wherein Mikolowski purportedly called Robin a rude name and claimed Robin retaliated against complaining staff members conveys the same sentiment, regardless of whether Mikolowski recalled the exact statements Kenward reported. And as was the case with the first two statements, Mikolowski's 2018 affidavit did not directly contradict Kenward's report. Instead, Mikolowski said only that she had not complained about or been mistreated by Robin.

The final unverified statement—that Mikolowski viewed Stanton's gift as a " 'F[***] You' on the way out"—was again uncontradicted by the 2018 affidavit. Mikolowski averred that Stanton was the best principal she had ever worked for, but her positive opinion of Stanton's professional performance does not negate the possibility that she construed Stanton's gift

negatively. To the contrary, that perception would be entirely consistent with other statements that Mikolowski confirmed as accurate, namely, that Stanton was rude to her on her last day of work and continuously "barked orders" at her all day long.

In sum, the evidence before the trial court did not demonstrate that any of the unverified statements were inaccurately reported. But more importantly, even if reasonable minds might differ on whether Kenward incorrectly reported some of Mikolowski's statements, the evidence does not support a conclusion that Kenward knowingly or recklessly misrepresented what Mikolowski said during the interview. The general tenor of the unverified statements is consistent with the portions verified by Mikolowski and the additional assertions in her first affidavit. The only evidence plaintiffs cite to rebut Kenward's assertion that any inaccuracies were minor and unintentional is Mikolowski's vague assertion that Kenward admitted having "an issue" with Stanton. We agree with the trial court that this perfunctory reference to an unspecified personal issue would not cause reasonable minds to believe that Kenward knowingly fabricated the statements challenged by plaintiffs.

Presented with Kenward's affidavit swearing that she tried to report the interview accurately, and without evidence suggesting that Kenward knowingly or recklessly reported false statements, the trial court did not err by concluding that plaintiffs' intentional torts were barred by governmental immunity.

## IV. DEFAMATION CLAIM

Plaintiffs argue that the trial court erred by granting summary disposition of their defamation claim because Kenward's substantial-truth argument mischaracterized the nature of their claim. It appears that plaintiffs have simply renewed all of their arguments in response to Kenward's dispositive motion, without consideration of the trial court's reasons for granting summary disposition. Although Kenward argued below that her statements regarding Stanton's unprofessional conduct could not support a defamation claim because they were substantially true, the trial court did not address that theory in its ruling. Instead, it concluded that summary disposition of the defamation claim was appropriate for three reasons: there was no evidence that Kenward was acting with malice, her communications with Woodside and other ABSD administrators did not constitute publication, and she was entitled to qualified immunity.

"[A]s an error-correcting court, this Court's purpose is to determine if the trial court made an error when it rendered its decision." *Wolfenbarger v Wright*, 336 Mich App 1, 27; 969 NW2d 518 (2021). We are not precluded from reviewing an issue raised before the trial court merely because the trial court failed to address it, *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994), but we will not ordinarily decide issues that are deemed moot, *Garrett v Washington*, 314 Mich App 436, 449; 886 NW2d 762 (2016). "A matter is moot if this Court's ruling cannot for any reason have a practical legal effect on the existing controversy." *Id.* (quotation marks and citation omitted). Here, even if this Court agreed with plaintiffs' position regarding the substantial truth doctrine, it would not provide a basis for granting appellate relief unless the trial court's actual reasons for granting summary disposition were also erroneous. And if all the trial court's stated reasons were erroneous, plaintiffs would not have to challenge Kenward's substantial truth theory to obtain relief unless she advanced it as an alternative ground for affirming. In other words, a favorable ruling regarding the substantial truth doctrine would not

have a practical effect at this juncture. As such, we decline to address this aspect of plaintiffs' claim of error.

Plaintiffs also contend that because Kenward was the source of the misinformation that was shared with third parties by Woodside and other administrators, she is responsible for those publications. We disagree.

Plaintiffs correctly note that our Supreme Court has previously stated that "all persons who cause or participate in the publication of [a] libelous or slanderous matter are responsible for such publication . . . ." *Bowerman v Detroit Free Press*, 287 Mich 443, 451; 283 NW 642 (1939). The trial court's reasoning regarding this issue is unclear,[4] but it does not appear that the court considered whether the secondhand publication of Kenward's statements by others satisfied the publication element. Nonetheless, any error regarding this issue does not warrant appellate relief. A trial court's error or omission "is not ground for . . . vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice." MCR 2.613(A). Assuming, without deciding, that plaintiffs could establish the publication element, Kenward was still entitled to summary disposition because she was immune from liability as a government employee for the reasons explained in Part III of this opinion. Thus, any error regarding the publication element was harmless.

## V. COMMON-LAW PRIVILEGE

Next, plaintiffs argue that Kenward's statements were not protected by a common-law privilege. We disagree.

Actionable defamation requires "an unprivileged communication to a third party." *Mitan v Campbell*, 474 Mich 21, 24; 706 NW2d 420 (2005). If a communication is protected by a qualified privilege, the plaintiff must prove "that the statement was made with actual malice, i.e., with knowledge of its falsity or reckless disregard of the truth." *Prysak v RL Polk Co*, 193 Mich App 1, 15; 483 NW2d 629 (1992). In her motion for summary disposition, Kenward argued that all plaintiffs' claims were premised on defamation, plaintiffs' did not have a valid defamation claim because Kenward's statements were protected by multiple common-law privileges, and plaintiffs could not prove malice by clear and convincing evidence. The trial court acknowledged that Kenward's motion raised a question regarding the applicability of common-law privilege, but did not indicate whether it agreed with Kenward's claimed privileges. It did, however, note that Kenward's communications to "the Superintendent or others that she would be required to share that information with" would not satisfy the publication element. We construe this comment as

---

[4] With respect to publication, the trial court said that if Kenward shared the results of her interview "with the superintendent or others that she would be required to share that information with it's, it's not a publication." It appears that the trial court was likely addressing the question of privilege and concluding that Kenward's disclosures did not constitute an *unprivileged* publication.

implicating two privileges asserted by Kenward: the privilege outlined in 3 Restatement Torts, 2d, § 598A,[5] and the shared interest privilege.

Concerning the latter, Michigan has long recognized a qualified privilege extending "to all communications made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty." *Timmis v Bennett*, 352 Mich 355, 366; 89 NW2d 748 (1958), quoting *Bacon v Mich Central R Co*, 66 Mich 166, 170; 33 NW 181 (1887). The qualified privilege encompasses not only legal duties, but also moral and social obligations. *Timmis*, 352 Mich at 366. The evidence demonstrates that Kenward received a complaint regarding Stanton's gift, which the writers found "offensive and disgusting." Kenward reported the complaint to Woodside, who directed her to interview Mikolowski about the incident, thereby imposing upon Kenward a duty to follow up with Mikolowski about what occurred. After doing so, Kenward shared the results of the interview with Woodside and other ABSD administrators, allowing them to determine how best to respond to the situation. Because an employer may avoid vicarious liability for hostile work environment claims if it takes prompt remedial action upon learning of the alleged harassment, *Chambers v Trettco, Inc*, 463 Mich 297, 312; 614 NW2d 910 (2000), ABSD and, by extension, its superintendent and administrators, had a clear interest in the subject-matter of the allegedly defamatory communication.

It could also be said that Kenward had an interest in the subject matter, while ABSD and its administrators had a corresponding duty. Kenward averred that as a "female school administrator who worked in" the same building as Stanton, she considered Stanton's behavior "unprofessional, inappropriate, and sexually harassing." While Woodside and ABSD may not have had a legal *duty* to investigate the anonymous complaint, they certainly had a moral or social obligation to ensure that the high school principal was not engaging in sexually inappropriate behavior in the workplace and respond accordingly if the complaint was determined to be true. Because the communications at issue related to a subject matter in which Kenward, Woodside, and ABSD had a shared interest, Kenward's statements were protected by a qualified privilege. See *Timmis*, 352 Mich at 366. Kenward's statements fell within the ambit of an established common-law privilege. As such, we need not decide whether Michigan also recognizes the privilege outlined in 3 Restatement Torts, 2d, § 598A.

Since the allegedly defamatory statements were protected by a qualified privilege, plaintiffs had to prove "that the statement was made with actual malice, i.e., with knowledge of its falsity or reckless disregard of the truth." *Prysak*, 193 Mich App at 15. But the evidence before the trial court did not demonstrate that any of the statements Mikolowski could not recall making were actually false or that Kenward knowingly or recklessly misrepresented her interview with Mikolowski. As more fully explained in Part III, plaintiffs did not present evidence that would cause reasonable minds to differ regarding actual malice. Thus, to the extent the trial court granted

---

[5] "An occasion makes a publication conditionally privileged if an inferior administrative officer of a state or any of its subdivisions who is not entitled to an absolute privilege makes a defamatory communication required or permitted in the performance of his official duties." 3 Restatement Torts, 2d, § 598A.

summary disposition on the basis of privilege and the absence of actual malice, it did not err by doing so.

## VI. TORTIOUS INTERFERENCE WITH LSD CONTRACT

Plaintiffs maintain on appeal that Stanton has a valid tortious interference claim against Kenward with respect to Stanton's LSD contract because Kenward was, at minimum, the source of the defamatory information communicated to LSD. We disagree.

In order to establish a claim of tortious interference with a contract, the plaintiff must prove, among other things, that the defendant unjustifiably instigated a breach of contract. *Knight Enterprises, Inc v RPF Oil Co*, 299 Mich App 275, 281; 829 NW2d 345 (2013). Plaintiffs admitted they had no evidence that Kenward was the person who alerted LSD of the reason for Stanton's resignation from ABSD. Even so, they contend that Kenward can still be held liable for tortious interference with Stanton's LSD contract because she was the one who fabricated the information that was shared with LSD. In support of this theory, plaintiffs again cite the *Bowerman* Court's statement of "the general rule that all persons who cause or participate in the publication of [a] libelous or slanderous matter are responsible for such publication . . . ." *Bowerman*, 287 Mich at 451. *Bowerman*, however, is a defamation case, and plaintiffs have not cited any authority supporting the notion that this "general rule" applies to other tort claims, like intentional interference with a contract.

Our review of Michigan precedent regarding tortious interference claims suggests that plaintiffs' theory of indirect liability lacks merit. Again, "it is an essential element of a claim of tortious interference with a contract that the defendant 'unjustifiably instigated or induced' the party to breach its contract." *Knight Enterprises*, 299 Mich App at 281 (citation omitted). With respect to this element, this Court has found the following comment helpful:

> The essential thing is the purpose to cause the result. If the actor does not have this purpose, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other. It is not necessary, however, that the purpose to cause the breach of contract or failure to deal be the actor's sole or paramount purpose. It is sufficient that he designs this result whether because he desires it as an end in itself or because he regards it as a necessary, even if regrettable, means to some other end . . . . [*Id.*, quoting 4 Restatement Torts, § 766, comment d, pp 54-55.]

Here, even if this Court presumed Kenward intended that Stanton would lose his job with ABSD, it can hardly be said that she intended the statements in her investigation notes to interfere with Stanton's LSD contract—a contract that was not in existence or even contemplated at the time of Kenward's investigation. Thus, in the absence of evidence that Kenward was the person who told LSD about Stanton's reason for resigning from ABSD, the trial court did not err by granting summary disposition of this claim.

## VII. TORTIOUS INTERFERENCE WITH ABSD CONTRACTS

Plaintiffs also argue that the trial court erred by granting summary disposition of their tortious interference claims concerning their ABSD contracts because there was a question of fact regarding whether Kenward was acting solely on her own behalf. We disagree.

A claim for tortious interference with a contract cannot be maintained against a party to the contract. *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 382; 689 NW2d 145 (2004). Thus, "corporate agents are not liable for tortious interference with the corporation's contracts unless they acted solely for their own benefit with no benefit to the corporation." *Reed v Mich Metro Girl Scout Council*, 201 Mich App 10, 13; 506 NW2d 231 (1993). Plaintiffs contend that the trial court erred by granting summary disposition of Count III because the only evidence that Kenward was asked to interview Mikolowski was her own affidavit, which constituted inadmissible hearsay. Coupled with the fact that Kenward had personal issues with Stanton, plaintiffs opine that there was a question of fact regarding whether Kenward was acting solely for her own benefit.

When a party moves for summary disposition, only substantively admissible evidence may be considered. *Batista v Office of Retirement Servs*, 338 Mich App 340, 356; 980 NW2d 107 (2021), oral argument ordered on the application 969 NW2d 1 (2022). That is, the content or substance of the evidence must be admissible, even if it is not presented in an admissible form. *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 373; 775 NW2d 618 (2009). Hearsay, i.e., "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," MRE 801(c), is generally inadmissible, MRE 802.

In her affidavit, Kenward explained that when she reported the anonymous complaint to Woodside, he directed her to interview Mikolowski about the incident. As plaintiffs correctly point out on appeal, this statement is the only evidence that Kenward was asked to investigate the matter. Citing *People v Jones*, 228 Mich App 191, 204-205; 579 NW2d 82 (1998), mod in part on other grounds 458 Mich 862 (1998), Kenward argues that the foregoing statement does not constitute hearsay because she was reiterating a command, rather than an assertive statement. We agree. In its consideration of an evidentiary challenge, the *Jones* Court observed that hearsay must involve a statement, which is defined as " 'an oral or written assertion or . . . nonverbal conduct of a person if it is intended by the person as an assertion.' " *Id*. at 204, quoting MRE 801(a). The challenged evidence in *Jones*—testimony that a woman came to the witness's home and yelled, "[*****], come out"—did not constitute hearsay because it did not contain an assertion and was incapable of being true or false. *Jones*, 228 Mich App at 204. The Court reasoned that the challenged testimony involved "a command, not an assertion, and cannot be hearsay because it doesn't qualify as a 'statement.' " *Id*. at 204-205. Here, the underlying out-of-court statement— Woodside's directive—was likewise not an assertion capable of being true or false. *Id*.

More to the point, plaintiffs' claim of error is premised on the implication that if Kenward was not specifically asked to interview Mikolowski, then she was acting for her own benefit and without benefiting ABSD. Plaintiffs' reasoning is clearly flawed. The precise scope of Kenward's duties as director of student services is not apparent from the record, but it is undisputed that Kenward holds an administrative position characterized as "Cabinet level." It is also undisputed

-11-

that Kenward received an anonymous written complaint about the impropriety of Stanton's gift to Mikolowski, that she spoke with Mikolowski about the incident, and that she reported her investigative findings to Woodside. ABSD subsequently relied on Kenward's information in evaluating Stanton's performance and responding to the complaint. Thus, regardless of whether Kenward was assigned the task of interviewing Mikolowski or chose to do so of her own accord after receiving the complaint, it is apparent that ABSD benefited from Kenward's investigation. Thus, as an ABSD agent who was not acting solely for her own benefit, Kenward could not be held liable for tortious interference with either plaintiffs' ABSD contract.[6] See *Reed*, 201 Mich App at 13. The trial court did not err by granting summary disposition of Count III on that basis.

## VIII. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Lastly, plaintiffs argue that the trial court erred when it determined that Kenward's actions were not extreme and outrageous. We disagree.

"To establish a prima facie claim of intentional infliction of emotional distress, the plaintiff must present evidence of (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Walsh v Taylor*, 263 Mich App 618, 634; 689 NW2d 506 (2004). Only the first element is at issue on appeal.

> "Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." The test is whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " [*Swain v Morse*, 332 Mich App 510, 534; 957 NW2d 396 (2020) (citations omitted).]

The trial court is tasked with the initial obligation of determining whether the defendant's conduct could be deemed sufficiently extreme and outrageous. *Hayley v Allstate Ins Co*, 262 Mich App 571, 577; 686 NW2d 273 (2004). "But where reasonable individuals may differ, it is for the jury to determine if the conduct was so extreme and outrageous as to permit recovery." *Id*.

The plaintiff in *Mino v Clio Sch Dist*, 255 Mich App 60, 64; 661 NW2d 586 (2003), was the superintendent of the defendant school district when concerns regarding his performance arose.

---

[6] To the extent Robin's claim is premised on allegations other than Kenward's reporting of the interview with Mikolowski, namely, Robin having been stripped of job duties, that theory is without factual support. Robin testified that she believed Kenward was responsible for the change in her duties, but she did not know who made the decision. The most Robin could attest to was that Kenward told the middle school assistant principal to respond to questions that would typically be directed to Robin and that Kenward did not provide a clear answer when Robin asked why she could no longer access the tools she needed to create a master schedule and teacher assignments.

In addition to the plaintiff's questionable job performance, the assistant superintendent told other district employees that the plaintiff was involved in an extramarital affair, "made sexual telephone calls," and "inappropriately touched local waitresses." *Id*. at 64-65. The assistant superintendent reiterated her concerns in a formal complaint, which the plaintiff denied. *Id*. at 65. When the plaintiff applied for a position elsewhere, a school board member told the prospective employer about community concerns regarding the plaintiff's professional performance, as well as what she considered "unsubstantiated rumors" that he engaged in "sexual improprieties." *Id*. at 66. Additionally, the public relations director purportedly circulated a memorandum that attacked the plaintiff's leadership style and accused him of mistreating her. *Id*. at 74-75. The plaintiff advanced an intentional infliction of emotional distress claim against the assistant superintendent, school board member, and public relations director, reasoning that "by spreading scandalous falsehoods and rumors" about the plaintiff, they engaged in outrageous conduct. *Id*. at 79. This Court affirmed the trial court's grant of summary disposition, opining that the challenged conduct "cannot be described as extreme or outrageous." *Id*. at 80.

*Mino* is sufficiently factually analogous to the instant case to support the same conclusion. Just as the defendants in *Mino* were accused of spreading "scandalous falsehoods and rumors" about the plaintiff's sexual behavior and alleged mistreatment of a coworker, plaintiffs' claim is premised on Kenward falsely reporting that Mikolowski accused him of sexual harassment and mistreatment. Consistent with *Mino*, we conclude that such a scandalous falsehood does not rise to the level of extreme and outrageous behavior, especially in light of the evidence that Stanton's inappropriate gift did, in fact, trigger a complaint from *someone*, even if Mikolowski did not personally complain of sexual harassment.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto
/s/ Kristina Robinson Garrett

-13-